## MIDLAND COOPERATIVE WHOLESALE
### v. ICKES, Secretary of the Interior,
#### et al.
#### No. 12085.

Circuit Court of Appeals, Eighth Circuit.
Jan. 27, 1942.

Daniel C. Rogers, of Fayette, Mo., for petitioner.

Walter Freedman, of Washington, D. C., Atty., Bituminous Coal Division, Department of the Interior (Nathan R. Margold, Sol., Department of the Interior, Arnold Levy, Gen. Counsel, Jesse B. Messitte, Asst. Gen. Counsel, John .R. Reed, and Cecelia Goetz, all of Washington, D.C., Attys., Bituminous Coal Division, Department of the Interior, on the brief), for respondents.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This is a petition to review an order of the Director of the Bituminous Coal Division of the Department of the Interior which denies the petitioner the right to register as a "distributor" under Section 4 II(h) of the Bituminous Coal Act of 1937, 15 U.S.C.A. § ʎ33, but allows it to qualify as an "intervening agency" under paragraph 13 of Section 4 II(i) of the Act upon complying with certain administrative conditions. The jurisdiction of this court is invoked pursuant to Section 6(b) of the Act, 15 U.S.C.A. § 836 (b). The petitioner is a non-profit wholesale cooperative association under the laws of Minnesota and is required by the statutes under which it is organized and its by-laws to annually distribute its "undivided surplus" or "net income" on the basis of patronage. Registered "distributors" are permitted under the Act and Regulations to purchase coal at a discount from established prices and the controversy between the Coal Division of the Department and the petitioner concerns the right of this cooperative to receive such discounts on the coal which it purchases. The order to be reviewed recognizes petitioner's right to receive the discounts upon qualifying as an intervening agency for all sales of coal in not less than cargo or railroad car-lots to retail associations which are "bona-fide legitimate farmers' cooperative organization[s]", but the right is denied in respect to any bituminous coal which petitioner purchases for re-sale to any organizations which do not come within the description of farmers' cooperatives. The order, as indicated by the accompanying opinion, was based on the conclusion that petitioner's distribution of its net income on the basis of patronage comes within the prohibition of paragraph 12 of Section 4 II(i) of the Act against securing for its patrons "either directly or indirectly a discount, dividend, allowance, or rebates, or a price other than that determined in the manner prescribed by this Act [subchapter]" and that it can only be excepted from the prohibition as specified in paragraph 13 .of Section 4 II(i), in respect to its business with "bona-fide

and legitimate farmers' cooperative organization[s]".

Although on final analysis the question for our decision is narrow, its importance justifies somewhat extended discussion. Counsel for petitioner have elaborated many particulars of hardship which have resulted and will result to it from denial of the "distributors" registration and have clearly pointed out the highly beneficial character of its co-operative method of purchasing commodities and the desirability of extending the method to bituminous coal. On the other hand, counsel for respondent have taken the burden of epitomizing the general objects, scope and administrative application of the Bituminous Coal Act and the provisions thereof which they contend prevent allowance to the petitioner of any broader registration than it has been accorded in the order.

The provisions of the Act primarily involved here are:

"Section 4 II(e) [§ 833(e)]. No coal subject to the provisions of this section shall be sold or delivered or offered for sale at a price below the minimum or above the maximum therefor established by the Commission [Division], and the sale or delivery or offer for sale of coal at a price below such minimum or above such maximum shall constitute a violation of the code * * *.

"The making of a contract for the sale of coal at a price below the minimum or above the maximum therefor established by the Commission [Division] at the time of the making of the contract shall constitute a violation of the code, and such contract shall be invalid and unenforceable * * *.

"Section 4 II(h) [§ 833(h)]. The Commission [Division] shall, by order, prescribe due and reasonable maximum discounts or price allowances that may be made by code members to persons (whether or not code members) herein referred to as 'distributors', who purchase coal for resale and resell it in not less than cargo or railroad carload lots; and shall require the maintenance and observance by such persons, in the resale of such coal, of the prices and marketing rules and regulations established under this section.

"Section 4 II(i) [§ 833(i)]. The following practices with respect to coal[1] shall be unfair methods of competition and shall constitute violations of the code:

  *   *   *   *   *

"12. Selling to, or through, any broker, jobber, commission account, or sales agency, which is in fact or in effect an agency or an instrumentality of a retailer or an industrial consumer or of an organization of retailers or industrial consumers, whereby they are [or] any of them secure either directly or indirectly a discount, dividend, allowance, or rebates, or a price other than that determined in the manner prescribed by this Act [subchapter].

"13. * * * It shall not be an unfair method of competition or a violation of the code or any requirement of this Act [subchapter] (1) to sell to or through any bona-fide and legitimate farmers' cooperative organization duly organized under the laws of any State, Territory, the District of Columbia, or the United States whether or not such organization grants rebates, discounts, patronage dividends, or other similar benefits to its members; (2) to sell through any intervening agency to any such cooperative organization; or (3) to pay or allow to any such cooperative organization or to any such intervening agency any discount, commission, rebate, or dividend ordinarily paid or allowed, or permitted by the code to be paid or allowed, to other purchasers for purchases in wholesale or middleman quantities.[2]"

■ The Congress enacted the Bituminous Coal Act in an effort to stabilize the bituminous coal industry and to preserve the vast coal resources of the nation.[3] In furtherance of these objectives it promulgated a system of regulation which centered around (1) the establishment of prices for bituminous coal[4] and (2) the promulgation of a code of fair trade practices in

---

[1] Section 17(a) of the Act, 15 U.S.C.A. § 847(a), provides "The term 'coal' means bituminous coal."

[2] Though this provision is found in the last paragraph of Section 4 II (i), it will be sometimes referred to as "paragraph 13" of Section 4 II (i) for the sake of convenience and to avoid confusion with petitioner's brief wherein it

is referred to as paragraph 13 and the Director's Order wherein it is similarly referred to.

[3] The constitutionality of the regulatory provisions of the Act has been upheld. Sunshine Anthracite Coal Company v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263.

[4] The Act authorizes the establishment

order that producers of bituminous coal might realize, as nearly as practicable, their weighted average costs of production.[5]

In the light of the history of the destructive competition which characterized the bituminous coal industry, it was clear that the Congressional purpose could be achieved only if care were taken to provide against avoidance or evasion of the price provisions of the Act. To that end Congress provided in Section 4 II(e) of the Act that "No coal * * * shall be sold or delivered or offered for sale at a price below the minimum or above the maximum therefor established * * *." From this broad prohibition Congress authorized only two exceptions. In Section 4 II(h) it authorized the allowance of discounts (in the amounts prescribed by the Division) from the minimum prices on sales of coal to "distributors" who purchase coal for the purpose of resale and in the last paragraph of Section 4 II(i) it made a similar exception for coal sold to a "bona-fide and legitimate farmers' cooperative" or to its "intervening agency."

In furtherance of the objectives of the Act, the Congress provided that a series of practices were to be deemed unfair methods of competition and were not to be engaged in by producers. Such proscribed practices are set out in Section 4 II(i) of the Act. Speaking generally, they are practices, previously employed in the coal industry, which have the effect of depressing the price of coal and which, if allowed, would facilitate the evasion of the price provisions of the Act. Among the proscribed practices are secret concessions, discriminatory extension of services, unjustified allowances, rebates, refunds, fee-splitting, and the sale to or through any broker, jobber, commission account, or sales agency which is an agency or an instrumentality of a retailer or an industrial consumer whereby they or any of them secure, either directly or indirectly, a discount, dividend, allowance, or rebate, or a price other than that determined in the manner prescribed by the Act.

Pursuant to statutory direction, the Director, following lengthy public hearings, promulgated schedules of minimum prices which became effective on October 1, 1940. Coincident with the establishment of minimum prices, the Director also issued the Marketing Rules and Regulations. These rules and regulations were designed to implement the regulation of prices by establishing rules controlling the various aspects of the sale of coal. They are concerned, among others, with such matters as sales agents, discounts, spot orders, contracts, terms of payment, and unfair methods of competition. These rules and regulations also provide that discounts from the minimum prices may be allowed only to persons authorized to receive them—which, under the Act, means distributors and bona fide farmers' cooperatives—and shall not exceed the maximum discount prescribed by the Division.

In furtherance of the Congressional policy of permitting sales of coal to distributors and farmers' cooperatives the Division has set up a system of registration under which the maximum discounts [6] prescribed by the Director are allowable only to those distributors and bona fide farmers' cooperatives which are registered with the Division.[7] Registration is afforded a distributor upon a showing that he is actively, continuously, and regularly engaged in the business of purchasing coal for resale.[8] It is stated by counsel that "the Division has since October 1, 1940, grant-

---

of both minimum and maximum prices. To date, only minimum prices have been established.

[5] The Act provides that producers of bituminous coal may accept membership in the "Bituminous Coal Code." Producers accepting such membership are required to abide by prices established for the coals produced at their mines and to conduct their business in accordance with the trade practices permitted by the Act.

[6] It is important to note that the Act does not authorize the Division to prescribe the actual discount; it authorizes the Division to prescribe the maximum discount. This is a clear indication that the provision was simply a means to carry out the pervasive objective of the Act of returning to producers, as nearly as practicable, their weighted average cost of production.

[7] The schedule of maximum discounts and the rules and regulations governing the registration of distributors and those regulating the registration of bona fide and legitimate farmers' cooperative organizations were promulgated, after a public hearing, in a proceeding known as General Docket No. 12.

[8] In connection with the administration of the registration of distributors, the Division has provided for the granting of "distributor's discounts" in particular

ed registration to 1,987 distributors. Registration is awarded a farmers' cooperative upon a showing that it is a bona fide and legitimate farmers' cooperative organization duly organized under the laws of any State, Territory, the District of Columbia, or the United States. To date the Division has registered twenty-three bona fide and legitimate farmers' cooperatives and four intervening agencies."

Though the Division has recognized that it is not necessary for farmers' cooperative organizations to comply with the same requirements demanded of "distributors" in order to receive discounts from the minimum prices and has consequently provided an entirely independent system of registration of each, it is required of both distributors and farmers' cooperatives as a condition to registration that they file an agreement not to violate, among other things, the minimum price provisions of the Act, the Marketing Rules and Regulations and the unfair trade practices enumerated in Section 4 II(i).[9]

The essential facts are not disputed and it clearly appears from the evidence and findings of the Director that Midland Cooperative Wholesale, petitioner, is a nonprofit wholesale cooperative organized in 1926 under the laws of Minnesota. It is owned by approximately 200 retail cooperative associations operating in Minnesota, Wisconsin, Iowa and South Dakota. Those retail associations are composed of approximately 110,000 individual members of whom over 85 per cent are farmers. All these constituent associations are not farm-

ers' cooperatives but many fall within the category of consumers' cooperatives. Petitioner serves in the capacity of a wholesaler to '(or purchasing agent for) its member cooperative associations, supplying them with many types of commodities. Since 1934 petitioner has been supplying bituminous coal to about 45 of its constituent retail associations. The coal purchased by petitioner is purchased chiefly from mines operating in West Virginia and eastern Kentucky and shipped to the retail associations by rail or lake. Petitioner's annual sales to its retail associations have amounted to about 600 carloads or about 24,000 tons of coal. All coal handled by petitioner is purchased for resale and is resold in not less than cargo or railroad carload lots.

Under the Minnesota law and petitioner's by-laws (par. 7, ch. 382, Laws of 1919, amended by ch. 23 of the Laws of 1921 and ch. 326 of the Laws of 1923; By-laws, Art. VII), petitioner is required annually to distribute its "undivided surplus" or "net income" on the basis of patronage. Patronage dividends are distributed to each constituent retail association on the basis of gross operating margins on the total quantity of each major commodity purchased by it. If petitioner were permitted to register as a "distributor" or otherwise permitted to purchase coal at a discount from the established prices the amount so derived and not expended in connection with the resale of the coal, and all other amounts made from the resale of the coal and not so expended, would be available for distribution to its constituent members as a patronage dividend.[10]

---

transactions although the person or company was unable to qualify as a distributor for the purpose of receiving discounts from the minimum prices on purchases and resales of coal generally. This situation is governed by the use of "permits" which are issued to cover specific transactions.

Section 304.17 (a) of the Rules and Regulations for Registration of Distributors provides that "any distributor whose application to this Division as a registered distributor has not been approved * * * may, nevertheless, make application to receive a distributor's discount on a specific transaction wherein he purchases coal for bona fide resale and actually resells it in cargo or railroad carload lots without physically handling such coal. * * *"

Section 304.17 (d) of the Rules pro-

vides that "upon a determination by this Division * * * that the transaction covered by the application constitutes a legitimate and essential service to the code member in connection with the bona fide distribution of his coal and that it otherwise conforms to the requirements and intent of Section 4 II (h) of the Act, as well as to the Marketing Rules and Regulations, the Division may approve such application for a permit."

[9] See Section 304.12 (b) of the Rules and Regulations for Registration of Distributors and Section 304.34 (b) of the Rules and Regulations for Registration of Farmers' Cooperative Organizations.

[10] Initially, petitioner sought registration as a "distributor" upon the agreement not to distribute patronage savings on its coal business. This agreement was withdrawn on May 7, 1941.

On December 9, 1940, petitioner filed an application pursuant to Section 304.11 of the Rules and Regulations for Registration of Distributors seeking permission to register as a distributor in accordance with Section 4 II(h) of the Act. A public hearing on such application was held before an examiner of the Division on January 6, 1941. The parties waived the preparation and filing of an examiner's report and the matter was thereupon submitted to Director Howard A. Gray, who, on May 22, 1941, made and entered his findings of fact and conclusions of law in this matter, in which he concluded that petitioner was not a "bona fide and legitimate farmers' cooperative," on the one hand, and could not qualify as a "distributor," on the other hand, because it was obligated to distribute patronage dividends on its coal business. However, the Director went on to say that because of the preponderance of farmers in the membership of the constituent organizations petitioner could qualify as an "intervening agency" in connection with the resale of coal to bona fide and legitimate farmers' cooperatives.

To that end the Director entered an order as follows:

"It Is Ordered, That petitioner, Midland Wholesale Cooperative, may qualify as an intervening agency under paragraph 13 of Section 4 II(i) of the Act, for all sales of coal in not less than cargo or railroad carload lots to retail associations which are bona fide and legitimate farmers' cooperative organizations, in the following manner:

"(a) By certifying to the Bituminous Coal Division, under oath, the names of all its retail associations which are bona fide and legitimate farmers' cooperative organizations duly organized under the laws of the state in which they are incorporated;

"(b) By agreeing, under oath, that it will not accept or retain any discount, price allowance, or commission on any bituminous coal which it purchases for resale to others than the bona fide and legitimate farmers' cooperative organizations whose names are filed with the Division."

It is from this action of the Director that petitioner has appealed and it is this order that it seeks to have set aside.

## Opinion.

It is contended for petitioner (1) that being incorporated as a purchasing agent it is ideally qualified to serve the best interests of consumers of coal; (2) that Congress was not aware of any distinction between and did not intend to discriminate between so-called "consumer cooperative organizations" like petitioner and so-called "bona fide and legitimate farmers' cooperatives" but intended to favor both alike in the Coal Act; (3) that the cooperative principle upon which petitioner is required by the Minnesota statute and its by-laws to distribute its savings is beneficial and not within the scope of any of the evils in the coal industry intended to be guarded against in the Act; (4) that petitioner comes within the class referred to in 15 U.S.C.A. § 833(h) as distributors and therefore is entitled to be registered as a distributor, even though it may subsequently make distribution of savings contrary to the intent of the Act; (5) that its distribution of its savings is a matter remote from interstate commerce and not connected with it; (6) that the order of the Director should be vacated and set aside because its provisions are contradictory and inconsistent and impose arbitrary and unreasonable conditions.

(1) (2) Bearing in mind the primary objective of Congress in enacting the Coal Act to stabilize the bituminous coal industry and the provision of the Act that no bituminous coal should be sold at a price below the minimum therefor established, it is to be noted that two exceptions were made by authorizing sale of coal at a discount from the established minimum prices to "bona-fide and legitimate farmers' cooperative[s]" in paragraph 13 and to "distributors" in Section 4 II(h).

The phrase "bona fide and legitimate farmers' cooperative" is not uncertain or ambiguous and there is nothing in the Act to indicate that the words were used in other than their customary and understood meaning. The form of the phrase is obviously chosen to accentuate the particular type of cooperative organization to be distinguished from other types of cooperative organizations and the other types are excluded. To expand the exception of

---

The letter withdrawing this agreement was submitted following the close of the hearing and does not appear in the printed record. However, petitioner acknowledges that this agreement was withdrawn.

paragraph 13 by identifying a consumers' cooperative with the farmers' cooperative would violate the cardinal rule of statutory construction which requires exceptions to be strictly construed. Also the description in paragraph 13 of a particular type of cooperative which is to be excepted from the general prohibitions of paragraph 12 necessarily excludes other types on the principle of expressio unius est exclusio alterius.

■ The phrases "farmers' cooperatives" and "consumers' cooperatives" are words of art which have acquired a fixed meaning through judicial interpretation and otherwise. See Garden Homes Co. v. Commissioner, 7 Cir., 64 F.2d 593, 596; Sunset Scavenger Co. v. Commissioner, 9 Cir., 84 F.2d 453, 455; National Outdoor Advertising Bureau v. Helvering, 2 Cir., 89 F.2d 878, 880; Co-operative Central Exchange v. Commissioner, 27 B.T.A. 17. Numerous federal statutes expressly restrict their provisions to farmers' cooperatives, whereas others refer either to cooperatives generally or to specified types of cooperatives. For example, Section 6 of the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 17, Section 1 of the Capper-Volstead Act, 42 Stat. 388, 7 U.S.C.A. § 291, the Agricultural Credit Act of 1913, 42 Stat. 1479, 12 U.S.C.A. § 351, Section 15(a) of the Agricultural Marketing Act, 49 Stat. 317, 12 U.S.C.A. § 1141j; Section 203(b) of the Motor Carrier Act, 49 Stat. 544, 49 U.S.C.A. § 303(b); and Section 3(a) (5) of the Securities Act of 1933, 48 Stat. 75, 15 U.S.C.A. § 77(c), are limited by their terms to farmers' cooperatives. On the other hand Section 4 of the Robinson-Patman Act, 49 Stat. 1528, 15 U.S.C.A. § 13b, refers to cooperative organizations generally [11] while the District of Columbia Cooperative Association Act, 54 Stat. 480, Pub. No. 642, 76th Cong., 3d Sess., refers to consumer cooperative associations alone (Section 3).

■ The pertinent legislative history of the Coal Act also demonstrates that the Congress intended to exclude such consumer cooperative organizations as the petitioner, which are not farmers' cooperatives, from the privileges accorded to farmer cooperatives in paragraph 13. The history has been summarized by counsel and is included because it is directly pertinent to decision.

"N. I. R. A. Period.—The Standards of fair competition in the Bituminous Coal Act of 1937 are in a large measure carried over from the 'Code of Fair Competition for the Bituminous Coal Industry' existing under the National Industrial Recovery Act [48 Stat. 195]. The provisions of Section 18, Article VI of that Code are so strikingly similar to the provisions of paragraph 12 of Section 4 II(i) of the Act that it is deemed advisable to set them out in the margin.[12] The provisions of the N. R. A. Code were interpreted to prohibit the sale of coal to or through or the giving of discounts to any cooperative organization. To correct this condition the President on October 23, 1933, issued Executive Order No. 6355, in which he recited that:

"In a number of codes * * * which have heretofore been approved * * * there have been included provisions designed to limit or prohibit the payment or allowance of rebates, refunds, or unearned discounts, * * *. Question has arisen as to whether provisions of such tenor do not preclude the payment of patronage dividends to members of bona fide and legitimate cooperative organizations, including farmers' cooperative associations. * * * *"

---

[11] That Section 4 of the Robinson-Patman Act was intended to encompass consumer cooperatives as well as farmers' cooperatives is clear. See H.Rept. 2287, 74th Cong., 2d Sess., Part I, p. 17, and Part II, pp. 18-19; H.Rept. 2951, 74th Cong., 2d Sess.

[12] Section 18 of Article VI of the "Code of Fair Competition for the Bituminous Coal Industry" provided as follows:

"Sec. 18. To sell to, or through, any broker, jobber, commission account, or sales agency, which is in fact an agent for an organization of retailers or industrial consumers, whereby they secure indirectly a discount, dividend, allowance, or rebates, or a price other than that determined as provided in this code shall be a violation of this code."

Paragraph 12 of Section 4 II (i) of the Act provides as follows:

"12. Selling to, or through, any broker, jobber, commission account, or sales agency, which is in fact or in effect an agency or an instrumentality of a retailer or an industrial consumer or of an organization of retailers or industrial consumers, whereby they are [or] any of them secure either directly or indirectly a discount, dividend, allowance, or rebates, or a price other than that determined in the manner prescribed by this Act [subchapter]."

Thereupon the President ordered:

" * * * That no provision in any code of fair competition, agreement, or license, which has heretofore been or may hereafter be approved * * * shall be so construed or applied as to prohibit the payment of patronage dividends in accordance with law to any member by any bona fide and legitimate cooperative organization, including any farmers' cooperative, duly organized under the laws of any State, Territory, or the District of Columbia or of the United States, if such patronage dividends are paid out of actual earnings of such cooperative organization and are not paid at the time when such member makes a purchase from such cooperative organization.

"On February 17, 1934, the President issued Executive Order No. 6606-A, which supplemented and amplified Executive Order No. 6355, in which it was ordered that:

"1. No provision in any code of fair competition agreement or license which has heretofore been or may hereafter be approved, prescribed, or issued pursuant to Title 1 of the National Industrial Recovery Act, shall be construed or applied so as to make it a violation of any code of fair competition to sell to or through any bona fide and legitimate cooperative organization, including any farmers' cooperative, duly organized under the laws of any State, Territory, or the District of Columbia, or of the United States, or to sell through any intervening agency to such cooperative organization.

"2. No such code of fair competition shall be construed or interpreted so as to prevent any such cooperative organization from being entitled to receive, and/or distribute to its members as patronage dividends or otherwise the proceeds or benefits directly or indirectly derived from any discount, commission, rebate, or dividend (a) ordinarily paid or allowed to other purchasers for purchases in wholesale or middleman quantities, or (b) paid or allowed pursuant to the requirements or provisions of any code of fair competition to other purchasers for purchases in wholesale or middleman quantities.

"Thus by virtue of the Executive Order all cooperative organizations, farmers' and consumers' cooperatives alike, were afforded similar treatment. However, in May 1935 the National Industrial Recovery Act was declared unconstitutional by the Supreme Court in its decision in Schechter Poultry Corporation et al. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.

"74th Congress.—Shortly after the invalidation of the N. I. R. A. both Houses of Congress passed substantially similar bills designed to salvage for the depressed coal industry at least certain of the benefits experienced under the Recovery Program. The bill passed by the Senate, borrowing the language of the President's Executive Orders, exempted all 'bona fide and legitimate cooperative organizations (including any farmers' cooperative * * *)' from the provisions of paragraph 12 of Section 4 II (i). But the House, whose original bill contained no exemption for cooperatives, did not join in this proposal, and in the conference the provision was narrowed to exempt only 'bona fide and legitimate farmers' cooperative organizations.' It was this compromise version which passed both the Senate and the House.

"The history of this legislation in greater detail is as follows: On June 13, 1935, Representative Snyder introduced in the House of Representatives H. R. 8479, a Bill designed to regulate the bituminous coal industry. This bill, while containing an enumeration of unfair methods of competition similar to that contained in Section 4 II (i) of the present Act, made no exemption for cooperative organizations. The Bill [13] was reported to the House without amendment (79 Cong.Rec. 13195). In debate before the House numerous amendments were proposed but none concerned unfair methods of competition or exemption therefrom (79 Cong.Rec. 13442-13489, 13507-13572). On August 19, 1935, the bill passed the House with the unfair methods of competition provision unchanged (79 Cong.Rec. 13667).

"Beginning in January 1935 several bills for the regulation of the coal industry had been introduced in the Senate. The last of these, S. 2481, which was similar to H.R. 8479 and H.R. 9100, had been reported out of committee, but on August

---

[13] On August 12, 1935, Rep. Snyder introduced H.R. 9100 which, like H.R. 8479, was referred to the House Committee on Ways and Means. The bill did not differ in any essential respect from H.R. 8479 and no separate hearings were held thereon by the Ways and Means Committee. The Committee's report, however, was made on H.R. 9100.

consideration thereof was postponed indefinitely at the request of Senator Guffey, its author, because of the passage by the House of H.R. 9100 (79 Cong.Rec. 14085). During the debate on H.R. 9100 which took place on the floor of the Senate, Senator Murphy, of Iowa, proposed an amendment to Section 4 II(i) by adding an exemption for 'bona fide and legitimate cooperative organizations (including any farmers' cooperative duly organized under the laws of any State, Territory, District of Columbia, or the United States) * * *.' The introduction of this amendment was accompanied by a discussion in which Senator Murphy pointed out that he was trying to accomplish under the Act what the President had accomplished by his Executive Orders under the N. I. R. A., and that in the absence thereof paragraph 12 would make unlawful the sale of coal to or through cooperatives on the same terms as sales to conventional wholesalers. After some discussion, the amendment was agreed to (79 Cong.Rec. 14061, 14062) and subsequently the bill was passed by the Senate (79 Cong.Rec. 14084).

"Thereupon a conference was had on the bill between the House and the Senate conferees. The conferees amended the provision adopted by the Senate and limited it to 'any bona fide and legitimate farmers' cooperative organization' (H. Rept. No. 1895, 74th Cong., 1st Sess., p. 4.)[14] The 'Statement of the Managers on the Part of the House' accompanying the Report makes reference to the amendment with the following explanation (at p. 4):

"The House recedes with an amendment which confines the operation of the provision to farmers' cooperative organizations and to intervening agencies in connection therewith.

"Both the House and the Senate agreed to the conferees' report, and the Act passed both Houses of Congress (79 Cong.Rec. 14240, 14247, 14363-4), and upon approval on August 30, 1935, became Public No. 402, 74th Cong., generally known as the 'Bituminous Coal Conservation Act of 1935.' 49 Stat. 991.

"The Act was short-lived however, for on May 18, 1936, because of certain labor provisions therein contained, it was declared to be unconstitutional. Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160. Following this decision of the Supreme Court, attempts were made in both the House and the Senate during the Second Session of the 74th Congress to have new bills regulating the bituminous coal industry passed, but these attempts proved unsuccessful.[15]

"75th Congress.—The history of the provision exempting cooperatives from the effect of Section 4 II(i), which provision is the present paragraph 13, in the Bituminous Coal Act of 1937, parallels that of the similar provision contained in the Bituminous Coal Act of 1935. The single difference was that this time the Senate proposed to limit the exemption to farmers' cooperatives as it had been enacted in the 1935 Act, which exemption the House, still somewhat inclined to oppose any special treatment for cooperatives, reluctantly accepted. This clearly appears from the more detailed history of the provision in the 75th Congress as is set forth below.

"On January 6, 1937, promptly upon the convening of the 75th Congress, Senator Guffey introduced S. 1 which was referred to the Committee on Interstate Commerce

[14] "The Senate provision had read as follows:
"It shall not be an unfair method of competition or a violation of the code or any requirement of this Act (1) to sell to or through any bona fide and legitimate cooperative organization (including any farmers' cooperative duly organized under the laws of any State, Territory, the District of Columbia, or the United States), whether or not such organization grants rebates, discounts, patronage dividends, or other similar benefits to its members * * *".
The provision as agreed to by the conferees was changed to read:
" * * * (1) To sell to or through any bona fide and legitimate farmers' cooperative organization, duly organized under the laws of any State, Territory, the District of Columbia, or the United States, whether or not such organization grants rebates, discounts, patronage dividends, or other similar benefits to its members * * *".

[15] "S. 4668 was introduced in the Senate, and H.R. 12800 was introduced in the House on May 20, 1936 (80 Cong. Rec. 7565, 7657). The House passed H.R. 12800 (80 Cong.Rec. 9637); the Senate considered but failed to take action thereon prior to the sine die adjournment on June 20, 1936 (80 Cong. Rec. 10480 et seq.).

(81 Cong.Rec. 64). The bill was similar to the 1935 Act except that it had been stripped of its labor provisions. The provision with respect to farmers' cooperatives was the same as that contained in the 1935 Act. During the hearings on this bill, attention was again directed to the problem of the exemption afforded farmers' cooperatives. See Hearings Before a Subcommittee of the Senate Committee on Interstate Commerce on S. 1, 75th Cong., 1st Session, pp. 24 and 69. Certain members of the Subcommittee indicated a desire to drop the cooperative exemption, whereas others felt that if the exemption was to be granted, it might well be extended to all types of cooperatives. However, after some discussion the Subcommittee determined to retain the provision of the 1935 Act. This provision was accepted by the Senate Subcommittee and later recommended to the Senate.

"In the meantime the House was considering H.R. 4985, a bill introduced by Representative Vinson on February 22, 1937, and referred to the Ways and Means Committee (81 Cong.Rec. 1476). That bill differed from S. 1 in that it contained no exemption for farmers' cooperatives. The House Committee on Ways and Means reported the bill without any amendment and with a recommendation that it be passed. See H.Rept. No. 294, 75th Cong., 1st Sess. During the debate and discussion which ensued in the House, Representative Boileau of Wisconsin, offered as an amendment to Section 4 II (i) the present farmers' cooperative exception, stating (81 Cong.Rec. 2115):

"The sole purpose of this amendment is to provide that the restrictions of Paragraph 12 shall not apply to farmers' cooperatives and farmers' cooperatives only.

"In the discussion that followed, the question was posed whether the amendment ought to be changed to avoid discrimination against consumers' cooperatives, but no move to effect any change was made (81 Cong.Rec. 2116). Following some discussion, the amendment, even though limited to farmers' cooperatives, was rejected (81 Cong.Rec. 2118) and the bill was passed by the House on March 11, 1937 (81 Cong.Rec. 2126).

"On the following day the bill was referred to the Senate which body referred it to its Committee on Interstate Commerce. In its report on that bill, as well as on S. 1 (S.Rept. No. 252, 75th Cong., 1st Sess.), it was recommended that the bill be passed upon the inclusion therein of the present paragraph 13 of Section 4 II (i). The bill with such a provision included passed the Senate on April 5, 1937 (81 Cong.Rec. 3145). The House refused to agree to the amendment and requested a conference (81 Cong.Rec. 3173). At the conference, the Senate included provision again controlled and the House voted on and passed a bill which contained the present paragraph 13 (House Conference Rept. No. 578, 75th Cong., 1st Sess.; 81 Cong.Rec. 3390). The Senate also accepted the Bill as agreed to by the conferees, after assurance was given Senator Borah that the farmers' cooperative exemption had not been removed (81 Cong.Rec. 3315). The bill was signed by the President on April 26, 1937, and became Public No. 48, 75th Congress, known as the Bituminous Coal Act of 1937.

"77th Congress.—Since by its terms the Bituminous Coal Act of 1937 was to expire on April 26, 1941, the question as to the wisdom of extending it and as to the form in which it should be extended again brought before the Congress the necessity of considering the treatment given cooperatives under the Act. That the Division felt itself bound by the language of the Act to limit the exemption of paragraph 13 of Section 4 II(i) to farmers' cooperatives had already been indicated. Consequently representatives of consumers' cooperatives appealed to the Congress that the Act be amended to cure 'the defect' so as to include consumers' cooperatives within the scope of paragraph 13. Both the House and the Senate Committees rejected the requested modification. An attempt to amend the Act in this respect was made on the floor of the House and was defeated; a similar amendment proposed on the floor of the Senate was withdrawn.[16] The Act, then, so far as cooperatives are concerned, was extended without change, paragraph 13 of Section 4 II(i) remaining limited to farmers' cooperatives.

"The history of the discussion as to the modification of this section in connection with the consideration given the exten-

---

[16] The proposed amendment was subsequently reintroduced (S. 1315) and is now pending before the Senate Committee on Interstate Commerce to which it was referred.

sion of the Bituminous Coal Act of 1937, is particularly illuminating. On January 31, 1941, Senator Guffey introduced S.J. Res. 32 and Representative Boland introduced H.J.Res. 101 (87 Cong.Rec. 438, 459), the functions of which were to extend the Bituminous Coal Act of 1937 for a period of two years. Extensive hearings were held on these resolutions (and related measures). Hearings were first held by the House Committee on Ways and Means, at which representatives of consumers' cooperative organizations appeared and urged the immediate amendment of the Act in order to extend the exemption of paragraph 13 of Section 4 II(i) to wholesale consumers' cooperatives. Hearings before the House Committee on Ways and Means on H.J.Res. 101 (Revised), 77th Cong., 1st Session, pp. 26-28, 125-131, 136, 138-141, 145-151, 153-155, 158-164, 172-174, 601. Though at the time Director Gray had not yet acted upon the application of petitioner, Mr. Fortas, then general counsel of the Division, made it known to the Committee that in his opinion the provisions of the Act precluded the extension to consumers' cooperatives of the treatment afforded farmers' cooperatives. Mr. John Carson, on behalf of the Cooperative League of the United States, was one of the many witnesses who presented the case of the consumers' cooperatives. He asked that the Act be amended so as to remedy 'a defect.'[17]

"Several other persons, including Arthur J. Smaby, general manager of petitioner, appeared and testified in support of an amendment. Despite the many requests for amendment by representatives of cooperative organization interests, the Committee recommended extension of the Act, but declined to recommend any amendments concerning consumers' cooperatives.[18] When the bill was brought up on the floor of the House, Representative Gehrmann, of Wisconsin, asked that an amendment be adopted so as to extend to consumers' cooperatives the same treatment afforded farmers' cooperatives. The amendment, however, was defeated and the bill was passed without the amendment (87 Cong.Rec. 2665-2666).

"On March 31, 1941, H.R. 4146 was referred to the Senate which body referred it to its Committee on Interstate Commerce (87 Cong.Rec. 2692, 2698). A Subcommittee held hearings on the bill along with S.J.Res. 22 and S.J.Res. 32 and H.J.Res. 101. Here again the matter of amending the bill to provide for an exemption to paragraph 13 of Section 4 II (i) for consumers' cooperatives was acutely presented. Indeed, there was submitted for consideration a proposed amendment, introduced by Senators LaFollette, Ball and Capper, designed to accomplish that purpose. Here again extensive consideration was given to the desirability of amending the Act. See Hearings Before a Subcommittee of the Senate Committee on Interstate Commerce on S.J. 22, S.J.Res. 32, H.J.Res. 101, and H.R. 4146, 77th Cong., 1st Session, pp. 4-18, 20-27, 30-36, 41-52, 55-60, 62-64, 102-105. The 'Subcommittee reported to the full committee which, while recommending passage of the bill extending the Act for two years, refused to recommend an amendment designed to allow discounts to wholesale consumers' cooperatives. Indeed, it said that 'more experience in the administration of the Act and more detailed consideration than is [now] possible * * * are necessary before the committee can recommend such legislation, if any, as is necessary to deal with these problems.' S.Rept. No. 169, 77th Cong., 1st Sess., p. 2.

"On the date of submission of this report, the Senate proceeded to consider

---

[17] At p. 126 of Hearings before the House Committee on Ways and Means on H.J.Res. 101 (Revised), 77th Cong., 1st Sess.

Typical of the testimony was that given by Mr. Carson in reply to questions of Representative Jenkins. That testimony, appearing at pages 145-146 of the Hearings is as follows:

"Mr. Jenkins. * * * Section 13, as I understand it, deals exclusively with farmer cooperatives?

"Mr. Carson: Yes, Sir.

"Mr. Jenkins: It would be fair to assume that when we drew this bill we intended to give a sort of preference, or at least give the farmer cooperatives a fair chance, didn't we?

"Mr. Carson: Yes, Sir."

[18] Since, however, it desired to establish an independent office of the Bituminous Coal Consumers' Counsel, the House Committee determined to proceed by act rather than by resolution and therefore reported to the House H.R. 4146 to extend the Act and create an independent office of the Bituminous Coal Consumers' Counsel, H.Rept. No. 324, 77th Cong., 1st Sess.

the bill. Senator LaFollette on the floor of the Senate offered the amendment previously considered by the Senate Sub-committee which was designed to author-ize the granting of discounts to wholesale consumers' cooperatives. After some dis-cussion, however, the amendment was withdrawn (87 Cong.Rec. 3039), but in the ensuing discussion, statements by Senators Barkley, Bone, and Norris gave ample evi-dence that there was a complete under-standing in the Senate of the difference between farmers' and consumers' coopera-tives (87 Cong.Rec. 3039-3042). There-upon, H.R. 4146 was passed by the Senate on April 4, 1941 (87 Cong.Rec. 3044) and approved by the President on April 11, 1941, as Public No. 34, 77th Cong., 1st Session."

This legislative history indicates clearly that Congress was well aware of a dis-tinction between consumers' and farmers' cooperatives, that it was well aware that the Act extended certain treatment to farmers' cooperatives which it did not extend to consumers' cooperatives, and that it fully intended to do so. Under such circumstances, petitioner's contention that Congress was uninformed and that it had intended to extend certain benefits to consumers' cooperatives in the enactment of this Act and the extension thereof can-not be sustained. Congress had the right to discriminate between the types of co-operatives and it manifestly did so,[19] and the failure to treat them alike is neither novel nor unreasonable.

■ Laws fostering cooperative mar-keting and purchasing by farmers have a common genealogy. They stem from a desire on the part of federal and state legislators to extend to farmers ways to enable them to counteract the effects of an increasingly urban economy.[20] See Tigner v. Texas, 310 U.S. 141, loc. cit. 145 et seq., 60 S.Ct. 879, 84 L.Ed. 1124, 130 A.L.R. 1321; Liberty Warehouse Co. v. Burley Tobacco Growers' Co-operative Marketing Ass'n, 276 U.S. 71, loc. cit. 92, 96, 48 S.Ct. 291, 72 L.Ed. 473; see, also,

[19] In many states, the organization of farmers' cooperatives is authorized by one statute whereas the organization of other types of cooperative organiza-tions is authorized by an entirely differ-ent statute. For a comparison of state cooperative laws, see Hanna, Law of Co-operative Marketing Associations (1931), ch. 3.

[20] In connection with this Act, this mo-tive was present. The discussion of the 1937 Act on the floor of the House of Representatives included the following (81 Cong.Rec. 2116):

"Mr. O'Malley. Would this amendment affect city people who happened to be-long to a cooperative?

"Mr. Boileau. My amendment applies only to farmers' cooperatives. It is the same language as appeared in the original Guffey bill (act) and in the bill as originally offered by the Gentleman from Kentucky. I anticipate the gentle-man's question—why should it not apply to the cities?

"Mr. O'Malley. That is right.

"Mr. Boileau. We are out in the country. We do not have a coal agent out there in every community of the country. They want the right to buy coal in large lots, and the right to dis-tribute it to the individual members of the cooperatives."

See also the colloquy between Mr. Carson of the Cooperative League of the United States and Representative Knut-son which took place before a session of the House Committee on Ways and Means during the consideration of the resolution to extend the Act, Hearings before the House Committee on Ways and Means on H.J.Res. 101 (Revised), 77th Cong., 1st Sess., pp. 145-146:

"Mr. Knutson. Why can't you come in under subsection 2, page 12? Because you are not a farmer organization?

"Mr. Carson. Yes. Midland and C.C. W. (Central Cooperative Wholesale) are not seeking to be classified as farmers. The Ohio Farm Bureau Cooperative is very determined to go into the cities. It is recognized as a farmer cooperative, but it prefers the right to expand its operations into cities.

"Mr. Knutson. When they go into cities, with all due respect to them, they are not going to be able to get the con-cession given to farmers.

"Mr. Carson. I think Mr. Lincoln will be willing to abandon those concessions if they prevent him from expanding his cooperatives into cities. I think he will be very happy to.

"Mr. Jenkins. You know there are cer-tain groups in the country, such as the farmers, that have the inside track in the affections of the people, and the leg-islators. The farmers haven't got any more than is coming to them, but if they go down into the city to engage in busi-ness they cease to be farmers.

"Mr. Carson. We feel we have to ex-tend our activities into the cities."

Hearings before a Subcommittee of the Senate Committee on Agriculture and Forestry on S. 2605 (Bill to Amend Agricultural Marketing Act), 76th Cong. 3d Sess., passim; Hanna, Law of Cooperative Marketing Associations (1931), ch. 1. Some differentiation in treatment designed to encourage agriculture or related activities has customarily been sustained. Liberty Warehouse Co. v. Burley Tobacco Growers' Co-operative Marketing Ass'n, supra; Minnesota Wheat Growers' Co-op. Marketing Ass'n v. Huggins, 162 Minn. 471, 203 N.W. 420. The time may well come when the legislators will choose to extend the same or other encouragement to consumers' cooperatives. But, at least in the Coal Act, Congress has not taken that step.

(3) (4) The nature of petitioner's activities is fixed by the Minnesota law of its incorporation and by its by-laws which impose upon it the obligation to operate upon the cooperative principle of distributing its savings on the basis of its patronage. As the petitioner is concededly an agency or instrumentality of its member retailers and consumers, its method of distributing its savings derived from discounts received by it manifestly results in securing to them "either directly or indirectly a discount, dividend, allowance, or rebates, or a price other than that determined in the manner prescribed by this Act [subchapter]" within the plain meaning of paragraph 12. On these considerations the Director concluded the petitioner was not entitled to be registered as a "distributor".

It is true the petitioner is an organization which purchases coal for resale and sells it in not less than cargo or railroad carload lots and Section 4 II (h) of the Act [21] makes provision for discounts and price allowances to be made to such purchasers referred to as "distributors". But the section does not provide that every one who purchases coal for resale and sells it in not less than cargo or railroad carload lots automatically qualifies as a distributor and becomes eligible to receive discounts from the minimum price. To be

engaged in the occupation is merely one of the requirements. Another is that the "distributor", in the resale of coal, observe both the price schedules and the Marketing Rules and Regulations established under the Act.

It is clear that in terms of the purposes of the Act and its general scheme of regulation it would be impossible to maintain a floor under the prices paid producers by retailers and consumers if distributors, who are given the privilege of buying coal at discounts from the minimum prices, stood outside the regulatory pattern. Distributors would then be able consistently to undersell producers prohibited by the Act from selling coal at prices below the minimum price levels established by the Division. The framers of the Act, cognizant of the difficulties which would result from leaving distributors unregulated, therefore imposed upon the Division the duty of requiring distributors to maintain and observe the schedule of prices and the Marketing Rules and Regulations. These Marketing Rules and Regulations declare the practices enumerated in Section 4 II (i) of the Act as unfair methods of competition for producers, to be unfair practices for distributors. The effect of this is to ensure that distributors do not take an unfair competitive advantage of producers as a consequence of the privilege they enjoy of receiving discounts.

■ In furtherance of the duty imposed upon it by Section 4 II (h) of the Act of requiring distributors to observe the price and marketing regulations established under the Act, the Division requires, as a condition precedent to registration as a distributor, that each applicant for registration execute an "Agreement" to observe the prices established under the Act, to abide by the Marketing Rules and Regulations, and to comply with Section 4 II (i) of the Act. The exaction of such an agreement as a condition precedent to registration is in exact conformity with the statutory mandate that the Division "shall require" the maintenance by distributors of the regulations under the Act. Even in the absence of such a clear mandate, the

---

[21] "(h) The Commission shall, by order, prescribe due and reasonable maximum discounts or price allowances that may be made by code members to persons (whether or not code members), herein referred to as 'distributors', who purchase coal for resale and resell it in not less than cargo or railroad carload lots; and shall require the maintenance and observance by such persons, in the resale of such coal, of the prices and marketing rules and regulations established under this section."

right of the Division to set up such condition as a prerequisite to the granting of a license to obtain the privilege of buying coal below the minimum could not be questioned. United States v. Shissler, D.C., 7 F.Supp. 123. It is clear, however, that the authority of the Division to require each applicant for registration as a distributor to execute an agreement to observe the Act does not depend upon any general authority; it stems directly from the provisions of Section 4 II (h), the section dealing specifically with distributors.

It is the nature of petitioner's activities which disqualifies it from obtaining authorization to accept discounts from the established minimum prices. Petitioner is not like conventional wholesalers, engaging in the business of buying coal and then reselling it to such customers as it is able to find; it is not a distributive agency standing between producer and consumer and independent of both; it is a "purchasing agent" for its member associations. [22] As such it is an "instrumentality of retailers" within the provisions of paragraph 12 of Section 4 II (i)—or Rule 12 of Section XIII of the Marketing Rules and Regulations—and therefore is prohibited from receiving any discounts from the established prices. This prohibition applies irrespective of whether or not petitioner thereafter distributes any part of this discount to its member associations in the form of a patronage dividend. The prohibition is against the acceptance of the discount without regard to whether the discount is subsequently passed on to the member associations. Petitioner's argument that it should not be denied registration as a distributor until it has actually distributed patronage dividends on its coal business, must, therefore, be rejected.

Moreover, even if we were to assume, in the face of the petitioner's articles of incorporation, that it is a distributive agency standing between producer and consumer and independent of both, this would not establish its right to a listing on the Division's list of approved distributors. For it is not every distributor that is entitled to such listing, but only those distributors who will proceed in compliance with the Act and with regulations issued thereunder. It is incumbent upon each distributor seeking to be listed by the Division to show affirmatively that its practices conform to these requirements and that it intends to continue to conform thereto. The Director is not bound to assume the burden of proving that any given applicant violates or intends to violate those requirements. On the contrary, the Director is justified in refusing the listing applied for in any case where the applicant fails to show the conditions that would affirmatively justify a granting of the application.

The record does not show either that the applicant was conforming to the requirements in question at the time the application was filed or that it intended to do so in the future. This alone suffices to justify the rejection of petitioner's application. The argument for petitioner that petitioner may perhaps fail to violate the requirements by not ultimately distri-

---

[22] Art. II of petitioner's Articles of Incorporation read:

"The purpose of this association shall be to conduct a wholesale enterprise on the cooperative plan for the buying, selling and distributing of such commodities as are required in the business of operating and maintaining gasoline service stations, and oil truck service. Also any mercantile, jobbing, wholesale, and retail, mining, manufacturing or mechanical business on the cooperative plan, and it may buy, sell, and deal in the products of any other cooperative company or association heretofore or which may be hereafter organized.

"The general nature of its business shall be to act as purchasing agent for the members and patrons of this association, to contract for the members and patrons thereof such petroleum, petroleum products, oils, gasoline, kerosene, greases, oil products, and by-products, gasoline station equipment, goods, supplies and other forms of merchandise as are necessary in the operation of their business; and to promote and protect the interests of the constituent members of the association.

"For these purposes, it shall have the power and authority to purchase, hold, lease, mortgage, encumber, sell, exchange and convey such real estate, building and other property as the business of the association may require. It shall have power and authority, either for itself or its members and patrons, to do and perform every act and thing necessary and proper to the conduct of its business or the accomplishment of the purposes set forth herein or permitted by the act under which this association is incorporated. (Am. 6-12-34).

buting its savings on a patronage basis does not suffice to compel, or even to justify, a listing of petitioner on the Division's list of approved distributors.

■ In fact the record is less favorable to the petitioner than it would be if it contained no evidence whatever on the question of petitioner's conformity or intent to conform with the requirements of the statute. Actually, petitioner insists upon its right to pass along to its members, and ultimately to the consumers that it serves, the savings that might be derived from the distributor's discount that it seeks. ·Petitioner states that if it has any profit on its coal business, it plans to distribute it in the form of a patronage dividend. [23] Indeed, under the Minnesota law and its by-laws it is required to do so. Therefore, even if the only practice prohibited by the provisions of paragraph 12 of Section 4 II (i) were the passing along of the discount, petitioner still would not be entitled to registration as a distributor for it has failed to demonstrate that it does conform or that it intends to conform to all the requirements of the act, and has instead shown that it intends not to conform to those requirements.

There can be no question that the distribution of a patronage dividend on coal sold at the minimum price would operate to decrease the sale price below the established minimum or—to use the words of the Act—to "a price other than that determined in the manner prescribed by this Act." Having this effect, the payment by petitioner of a patronage dividend on such sales would be in violation of · paragraph 12 of Section 4 II (i) and the corresponding provision—Rule 12 of Section XIII of the Marketing Rules and Regulations.

In short, in the language of Section 4 II (h) of the Act, petitioner has not shown ability or intention to maintain and observe, in the resale of coal, the price provisions of the Act and Marketing Rules and Regulations established under Section 4 II (a) and (b). Every indication points to its being incapable of complying and unwilling to comply with the requirement, properly established by the Division in accordance with the language of Section 4 II (h) as a condition precedent to registration as a distributor, that it agree to observe the price provisions and the Marketing Rules and Regulations.

Under all these circumstances, it is clear that whatever discretion the Director has in the registration of distributors was properly exercised here by denying petitioner's application for registration.

■ It is of course true that there is nothing inherently evil in petitioner's practice of giving patronage dividends to its retail cooperative members, and that such dividends partake in no way of the unsavory character normally associated with rebates. But regardless of moral connotations, the Act is explicit in prohibiting "a discount, dividend, allowance, or rebates" whereby a retailer or industrial consumer is enabled to purchase coal at a price below the minimum price established under the Act. It is clear that what is prohibited here is any device which permits a code member to furnish coal to a retailer or consumer at a price below the minimum; since patronage dividends clearly tend to do so they are embraced within this broad prohibition.

■ The classes of persons privileged to buy below the minimum price are by the Act strictly confined to distributors, who perform a marketing function of service to producers, and to bona fide farmers' cooperative organizations, which Congress has singled out to be favored in many statutes. There is no inconsistency with state law but the mere fact that consumer cooperatives have been given by state law the privilege of operating does not compel that they be given on that account an additional privilege under a federal law, namely, a privilege to buy coal at a discount from the established prices.

(5) Petitioner's activities in the purchase of coal in the coal producing states and the sale of it in other states in interstate commerce and its receipt of discounts and ultimate distribution of the savings on the basis of patronage are intimately and directly connected with and affect such commerce.

■ Though a patronage dividend on its coal business would not be paid by petitioner until after the coal had come to rest in the retailer's yard or even later, the

---

[23] It should be noted that petitioner has a separate coal department. The profit, if any, on its coal business would not be an element in general profits distributed by petitioner to all its members but would be directly returned only to those of its members for which it has purchased coal.

fact remains that the dividend is related to and based upon the sale of the coal which the record shows to be coal which was moved in interstate commerce by rail or lake shipment from West Virginia and eastern Kentucky to Minnesota, Wisconsin, Iowa and South Dakota.[24] The fact that this payment comes after the shipment of the coal is completed does not serve to immunize its relationship from the interstate movement of coal. It is still as much a part of the transaction as if it were paid after each individual sale. Uniform Printing & Supply Co. v. Commissioner, 7 Cir., 88 F.2d 75, 76, 109 A.L.R. 966. Indeed, decisions under other federal acts regulating trade practices have never held that interstate commerce was not affected because the payment of the prohibited refund, rebate, discount, or dividend, or other prohibition took place after the movement of the goods in interstate commerce had ended. Quality Bakers of America et al. v. Federal Trade Commission, 1 Cir., 114 F.2d 393; Biddle Purchasing Co. et al. v. Federal Trade Commission, 2 Cir., 96 F.2d 687; Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 106 F.2d 667, certiorari denied 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521; Webb-Crawford Co. v. Federal Trade Commission, 5 Cir., 109 F.2d 268, certiorari denied 310 U.S. 638, 60 S.Ct. 1080, 84 L.Ed. 1406; Chamber of Commerce v. Federal Trade Commission, 8 Cir., 13 F.2d 673.

To accept petitioner's argument on this matter would go far to render impotent, if not completely to nullify, the effect of the provisions of Section 4 II (i) 12. To accept petitioner's contention would indicate to members of the coal industry that without violating the Act they may sell coal under a promise later to return to the vendee a rebate or discount and post-factum penalties would be completely ineffective as a corrective measure.

The patronage dividend is as much a part of the transaction as the price itself. If petitioner did not distribute patronage dividends or hold out they would do so—as under Minnesota law and its by-laws it must—there would doubtless be no sales of coal by it. Petitioner admits this.[25] It is its promise and obligation to pay patronage dividends on this coal business that provides the incentive for the purchase of coal from petitioner, and it is not denied that petitioner's purchases of coal are purchases in interstate commerce.

The payment of such dividend has the effect of decreasing the sale price below the established prices. It thus has an effect upon the price structure which sets the price for most of the bituminous coal production, all of which moves in or has been held directly to affect interstate commerce. Anything which affects that price structure necessarily affects interstate commerce.

Furthermore, the payment or even the expectation of the payment of patronage dividends has a direct and immediate effect upon interstate commerce in that the commission of any unfair competitive practices, enumerated in the Act, affects part of the industry and acts to disrupt the existing pattern of distribution and thereby must inevitably affect the interstate movement of coal.

The constitutionality of the regulation of unfair methods of competition by Congress, which regulation has been sustained by the courts, is predicated in a measure upon the disorganization of interstate commerce by competitive advan-

---

[24] To the extent that a claim might be made that the movement of coal is not in interstate commerce, Section 4-A of the Act provides a machinery whereby this matter may be tested. There is no indication that petitioner makes such claim or that it intended to do so before the Director.

[25] Support for the contention that the patronage dividend is as much a part of the transaction as the price itself is found in the position taken by cooperative associations—including the petitioner here—in connection with attempts to tax the fund from which dividends are paid. In these cases the cooperatives have successfully contended that such funds are not taxable as income for they represent undistributed refunds or rebates upon the original sale. Gallatin Farmers Co. v. Shannon, 109 Mont. 155, 93 P.2d 953; Midland Cooperative Wholesale v. Com'r, 44 B.T.A. 824, where the Board of Tax Appeals in sustaining petitioner's contention said, "The justification for the ruling rests upon the fact that the so-called dividends are in reality rebates upon the business transacted by the association with its members rather than true income to the association." If for purposes of taxation the dividend is part of the original transaction, is it not equally a part of the original transaction for the purpose of this case?

tages unfairly enjoyed. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 395, 60 S.Ct. 907, 84 L.Ed. 1263; cf. Carter v. Carter Coal Co., 298 U.S. 238-330, 332, 56 S.Ct. 855, 80 L.Ed. 1160. In drafting the Bituminous Coal Act it was recognized that minimum prices could not be established, maintained, and protected if rebates, refunds, and discounts, and other allowances given purchasers which act to lower established prices were permitted. Such practices, if permitted, would serve to give one seller an unfair advantage over others. Translated into this case, it means that petitioner, owing to the distribution of patronage dividends, enjoys some competitive advantage over the conventional distributor. An advantage of this kind, it is obvious, would tend to increase the business of petitioner at the expense of its competitors and would thereby affect the distribution of coal in the area in which petitioner operates. The distribution of patronage dividends must, therefore, necessarily intimately affect interstate commerce.

■ (6) We find no inconsistency or contradiction in the order made by the Director. The problem presented to the Director by the petitioner's application to be registered as a distributor was whether, in view of the nature of its organization and obligatory practices, petitioner could be authorized to purchase coal at a discount from the minimum prices for resale to those of its members which are consumers' cooperatives. That is the only question settled by the Director's order and the only question decided here. Responsive to that question the order consistently provides that petitioner may buy coal at a discount for resale to bona fide and legitimate farmers' cooperatives, but may not accept a discount on coal purchased for resale to others than farmers' cooperatives. The only conditions imposed are that the names of the farmers' cooperatives be furnished, together with an agreement to proceed in compliance with the order. The requirements appear to be fairly and reasonably adapted to aid in the enforcement of the Act and are entirely consistent with its provisions and requirements and with each other.

■ Whether consumers' cooperatives should be permitted to receive the discounts allowable generally to those who buy bituminous coal for resale and sell it in not less than cargo or railroad car load lots is for Congress and not for the courts, and Congress has acted.

The order is affirmed.