**In the Matter of**
**ISRAEL–BRITISH BANK (LONDON)**
**LIMITED, Bankrupt.**
**No. 74 Bkcy 1322.**

United States District Court,
S. D. New York.
Oct. 10, 1975.

Krause, Hirsch & Gross, New York City, for Israel-British Bank (London) Limited; Jack Gross, Sheldon Lowe, G. Oliver Koppell, New York City, of counsel.

Cadwalader, Wickersham & Taft, New York City, for Federal Deposit Ins. Corp., as successor in interest to Franklin National Bank; John J. Walsh, Earl H. Nemser, Paula Van Meter, New York City, of counsel.

Schwartz, Burns, Lesser & Jacoby, New York City, for Bank of the Commonwealth; Herbert P. Jacoby, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

This bankruptcy appeal raises an issue of first impression, which is of great significance to the international banking community. The economic interdependence among nations and the role of international banking in national and international affairs has evolved dramatically in this century. It is therefore understandable that when Congress in 1898 and 1910 specified in § 4 of the Bankruptcy Act who may and may not be adjudicated a bankrupt, it did not specifically address the question before us:[1] Does the Bankruptcy Court have jurisdiction to entertain a foreign banking corporation's voluntary petition in bankruptcy?

Despite the seeming simplicity of the issue, the question is thorny. As Justice Cardozo shrewdly observed, judicial construction of statutory language presents "a choice between uncertainties." Like Cardozo, "[w]e must be content to choose the lesser." *Burnet v. Guggenheim*, 288 U.S. 280, 288, 53 S.Ct. 369, 372, 77 L.Ed. 748 (1933).

## I.

### The Facts

On September 23, 1974 a voluntary petition in bankruptcy was filed on behalf of Israel British Bank (IBB) and on the same day it was adjudicated a bankrupt.[1] The Bank of the Commonwealth (Commonwealth) and the Federal Deposit Insurance Corporation (FDIC) as successor in interest to Franklin National Bank (Franklin) appeal from the decision of the Bankruptcy Court which denied Franklin's motion to dismiss IBB's petition and sustained the court's jurisdiction over IBB.

IBB is a corporation organized under the laws of the United Kingdom and formerly engaged in banking business with its principal place of business in London. It has never had a place of business, office or agent in the United States; has never been qualified to do business here; and never has done business in this country as a bank. IBB's property in this judicial district consists of deposits in various banks totalling several million dollars. On August 2, 1974, IBB filed a debtor's petition in Great Britain for the winding up of its affairs. Approximately four days later a Provisional Liquidator was appointed to safeguard the bank's property, and on December 2, 1974, the High Court, Chancery Division, of the United Kingdom approved IBB's petition and ordered the winding up of its affairs.

Appellants, FDIC and Commonwealth, are lien creditors of IBB in the amounts of $2,000,000. and $500,000. respectively. Both liens were perfected within four months of the filing of IBB's petition here. Consequently, if IBB is adjudicated a bankrupt under the Bankruptcy Act, a trustee in bankruptcy has the power to void those liens pursuant to § 67(a) of the Act, 11 U.S.C. § 107(a).

1. An amended petition, dated October 1, 1974, was filed on October 10, 1974. The parties have stipulated that this appeal be

## II.

### The Statute

Section 4 of the present Bankruptcy Act, 11 U.S.C. § 22, provides in relevant part:

"§ 22. Who may become bankrupts

(a) Any person, except a municipal, railroad, insurance, or banking corporation or a building and loan association, shall be entitled to the benefits of this title as a *voluntary bankrupt*.

(b) Any natural person, except a wage earner or farmer, and any moneyed, business, or commercial corporation, excepting a building and loan association, a municipal, railroad, insurance, or banking corporation, owing debts to the amount of $1,000 or over, may be adjudged an *involuntary bankrupt* upon default or an impartial trial and shall be subject to the provisions and entitled to the benefits of this title." (Emphasis added).

According to § 4(a), any person can file a petition as a voluntary petition except certain corporation, including "banking corporations." If IBB falls within the definition of "banking corporations" it may not file a petition; conversely, if the exception does not apply, it may enjoy the benefits of the Act.

In the decision below, Judge Galgay concluded that as a matter of law the term "banking corporation" in § 4(a) does not encompass foreign banks which have no business connection with the United States other than the location of assets here, and that the scope of the exception covers only "national banking corporations and banking corporations created under state and territorial laws." He held that IBB fell outside the scope of the exceptions to § 4(a) and accordingly could be adjudicated a voluntary bankrupt.

Contrary to the position adopted by the Bankruptcy Court and urged by

deemed addressed to the amended, as well as original petition.

IBB, FDIC and Commonwealth argue that (1) the legislative history of the Act fails to support the limitation of the exception to domestic banking corporations; (2) application of the exclusion to foreign banks does not frustrate the purposes underlying the "banking corporation" exception; and (3) the court is without power to modify an unqualified exception for "banking corporations" to cover only domestic banks.

### III.

### The Ambiguity of a Clear Statute

Although the parties devote considerable attention in their briefs to the legislative history of § 4, each side asserts that a mere reading of the statute immediately compels judgment in its favor.

Quite simply, IBB argues that while it was undeniably a bank in Great Britain, it was also quite definitely not a "bank" as such anywhere in the United States, and therefore does not fall within the "banking corporation" exception of § 4(a). The argument does not wash. There is no provision in the Act which states that a foreign corporation must *operate* as a bank within the United States in order either to enjoy the benefits of bankruptcy or to fit within the Act's exceptions, and of course the courts cannot write such a requirement into the Act. The corporations listed in § 4(a)— both those that may be adjudged a bankrupt and those that may not—are described only with reference to the character of the entities, not to the extent, if any, of actual operation. It would be one thing if IBB had never operated as a bank anywhere. But since its corporate activities have indisputably been in general those of a bank, it cannot avoid being so defined.

Another section of the Bankruptcy Act highlights the fact that the actual business of a corporation in the United States is unimportant for jurisdictional purposes. According to § 2 of the Act, the Bankruptcy Court has jurisdiction as a general matter over foreign persons and corporations solely on the basis of their having property located in the United States. 11 U.S.C. § 11a(1). The presence of assets—not the corporate activities within this county—is the predicate for jurisdiction over foreign corporations.[2] Indeed, a foreign bank which does extensive banking business within this country is nevertheless subject to bankruptcy adjudication solely on the basis of its assets here if its principal place of business is outside the United States. 11 U.S.C. § 11a(1). There is no authority for IBB's contention and we decline to adopt it.

There is greater appeal in the position of FDIC and Commonwealth that because the term "banking corporations" does not on its face admit of the refinement sought by IBB, no such restriction is permissible except by Congressional amendment.

Reference to the definitional section of the Act is necessary to understand appellant's position. The word "person" is defined in § 1(23) of the Act to include corporations; § 1(8) defines "corporations" to include:

". . . all bodies having any of the powers and privileges of private corporations not possessed by individuals or partnerships and shall include partnership associations organized under laws making the capital subscribed alone responsible for the debts of the association . . ."

Thus, the Act allows any corporation including foreign corporations with assets in the United States to file a petition in voluntary bankruptcy except for certain categories of corporations, including banking corporations. The term "banking corporation" has been sensibly construed to include "corporations which were authorized by the laws of their cre-

---

**2.** The dispute as to whether § 2(a)(1) is a jurisdictional or venue statute (see, e. g., *Bass v. Hutchins*, 417 F.2d 692 (5th Cir. 1969); *In re Eatherton*, 271 F.2d 199 (8th Cir. 1959)) is irrelevant to the issue at hand because the predicate of jurisdiction, if any, in this case is § 4.

ation to do a banking business." *Gamble v. Daniel,* 39 F.2d 447, 450 (8th Cir.), *appeal dismissed,* 281 U.S. 705, 50 S. Ct. 464, 74 L.Ed. 1129 (1930). FDIC and Commonwealth argue that a mere reading of § 4(a), together with §§ 1(23) and 1(8) ineluctably lead to the conclusion that a bank such as IBB, authorized under the laws of the United Kingdom to conduct a banking business, squarely falls within the meaning of "banking corporation." According to appellants, the clarity of the statute precludes the need or justification to search elsewhere for a guide to its effect in the case of foreign banks.

## IV.

### Legislative History

*A. A Note on the Propriety of Consulting Legislative History*

■ Despite the admonition by FDIC and Commonwealth that resort to legislative history is unwarranted, courts have not been chary to consider that history if it illuminates even superficially "clear" statutory language. See, e. g., *Lynch v. Overholser,* 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *United States v. American Trucking Associations,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *Knapp v. McFarland,* 462 F.2d 935, 939 (2d Cir. 1972); *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir. 1944) aff'd sub nom., *Gemsco, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945); but see, e. g., *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 395–97, 71 S. Ct. 745, 95 L.Ed. 1035 (1951) (concurring opinion) (Jackson, J.); Radin, "Statutory Interpretation," 43 Harv.L. Rev. 863 (1930) and Landis, "A Note on

'Statutory Interpretation'," *id.* at 886. While the words of a statute are of course the primary tool in divining legislative intent, judicial interpretation is not straitjacketed by those words if the legislative history evidences a purpose or objective at odds with a plain reading of the statute.

"It is said that when the meaning of language is plain we are not to resort to evidence in order to raise doubts. That is rather an axiom of experience than a rule of law and does not preclude consideration of persuasive evidence if it exists." *Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L. Ed. 170 (1928).

In any event, the debate in this case is largely one of academic interest for a review of the history of § 4 reveals, if nothing else, one stark conclusion: Congress has never considered whether foreign banks are to be treated differently than domestic ones.

*B. The History of Section 4*

*1. The Bankruptcy Act of 1898* [3]

Section 4 of the Bankruptcy Act of 1898 (Public Law 171, 55th Congress, 30 Stat. at L. 544, chap. 541), the original predecessor of the present law, provided:

"Sec. 4. Who May Become Bankrupts.—(a) Any person who owes debts, except a corporation, shall be entitled to the benefits of this Act as a voluntary bankrupt.

(b) Any natural person, except a wage-earner or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any corporation engaged principally in

---

3. The history of § 4 prior to 1898 may be summarized briefly. Under the Act of 1800 (which was repealed in 1803 (2 Stat. 248)) bankers resident within the United States could be adjudicated involuntary bankrupts, § 1 (2 Stat. 19). The Act made no provision for voluntary bankruptcy. The next bankruptcy act which was passed in 1841 and repealed two years later, provided in

§ 1 that resident banks could be adjudged both voluntary and involuntary bankrupts. The most immediate predecessor to the 1898 Act was the Bankruptcy Act of 1867, which also provided that resident banks and bankers, whether incorporated or not, were subject to both voluntary and involuntary adjudication. §§ 3, 9, 11. The Act was repealed in 1878.

manufacturing, trading, printing, publishing, or mercantile pursuits, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this Act. Private bankers, but not national banks or banks incorporated under State or Territorial Laws, may be adjudged involuntary bankrupts."

The act excluded all corporations from becoming voluntary bankrupts. While permitting certain business corporations to be adjudged involuntary bankrupts, the last sentence in § 4(b) excluded even from that category "national banks or banks incorporated under State or Territorial Laws."

As originally proposed, § 4(b) specifically excluded only "national" banks. As the following exerpts from the legislative history disclose, the reason for the exclusion was the existence of other more effective insolvency laws and procedures. The proponent of the bill in the Senate, Senator William Lindsay, explained:

"There is a law now in force for the control and regulation of national banks, and it was thought best not to interfere with that law. In certain contingencies the government is responsible for the assets of such banks, and it is but reasonable that it should have entire control of them and of their liquidation in cases of dishonesty or insolvency." 30 Cong.Rec. 602, 55th Cong., 1st Sess. (1897).

\*  \*  \*  \*  \*  \*

"There is already in existence a satisfactory law for the control and liquidation of national banks. Since the Government is responsible for the bank notes issued by these banks in the event of their failure, there is good reason why it should have control of their liquidation." 30 Cong. Rec. 606, 55th Cong., 1st Sess. (1897).

The House Judiciary Committee Report, House Report No. 65, 55th Cong.2d Sess. (1897) also noted the existence of other insolvency provisions as a reason for excluding national banks:

"The bill exempts national banks from being proceeded against in bankruptcy, for the reason that Congress has legislated especially in respect to them, and the most careful provisions exist for protecting all interests connected by the national banking laws." Id. at 40.

During the debate on the House Floor, Congressman Robert N. Bodine criticized the sweeping scope of § 4(b) and predicted problems which would result if publicly regulated corporations other than national banks were not also excluded:

"This bill is the first one of its kind to include corporations at all . . . It may be that there is a certain class of corporations that are as appropriately made subject to its provisions as are natural persons [such as those who] engage in any business of the same kind as that usually carried on by individuals. But, this bill goes much further than this. It embraces insurance companies, both fire and life, stock, mutual, assessment, or benevolent; it embraces building and loan associations, trust companies, savings banks, and all other State banks.

Now, in nearly every State in the Union there are chapters on chapters of the statutes regulating to the smallest minutia the proceedings in case of the insolvency of any of those classes of corporations . . . .

By this bill, at one fell swoop, all the jurisdiction of the several States as to these matters is taken away and vested in the trustee in bankruptcy, and the duties imposed by the State itself upon the officer of the bankrupt court, to be performed, no doubt, at an expense many fold greater; and if the experience of the past is any crite-

rion, the creditors, the beneficiaries, or depositors, as the case may be, will receive but a pittance, and the funds to which they are equitably entitled will go into the pockets of the court officials.

Under this bill a trustee in bankruptcy becomes the insurance commissioner, the railroad commissioner, the bank examiner and commissioner and the building and loan commissioner of the several States . . . Heretofore the Federal courts have confined themselves principally to carry on the business of the great railroads of the country; but now it is proposed to enlarge their business, to make them vast department stores, in which everything can be bought and every business conducted, from a railroad down to a peanut stand." 31 Cong. Rec. 1939, 55th Cong.2d Sess. (1898).

Despite Congressman Bodine's fears, the House passed the bill as reported by the House Judiciary Committee. At the request of the Senate, the bill was referred to a Conference Committee, which added the following sentence to § 4(b):

"Private bankers, but not national banks or banks incorporated under State or Territorial Laws, may be adjudged involuntary bankrupts."

No explanation for the additional sentence was given by the Committee except for the unilluminating statement that:

"The great railroad and transportation companies and banks incorporated under any law are left to be dealt with by the laws of the State creating them. It would lead to much confusion and hardship and many complications should we undertake to subject the great railroad and transportation corporations to the provisions of this act. It is believed that they can be better dealt with under other laws." 31 Cong.Rec. 6426 55th Cong., 2d Sess. (1898).

### 2. Amendments of 1903 and 1910

While Congress amended § 4(b) in 1903, the exclusion of "private bankers . . ." remained unchanged.[4]

However, Congress substantially revised § 4 in 1910. As amended, the section provided:

"Sec. 4. Who may become bankrupts.—(a) Any person, except a municipal, railroad, insurance, or banking corporation, shall be entitled to the benefits of this Act as a voluntary bankrupt.

(b) Any natural person, except a wage-earner or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any moneyed, business, or commercial corporation, except a municipal, railroad, insurance, or banking corporation, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this Act.

The bankruptcy of a corporation shall not release its officers, directors, or stockholders, as such, from any lia-

---

4. Section 4(b) as amended in 1903 (Public Law 62, 57th Congress, 32 Stat.L. 797, Chap. 487) provided:
"(b) Any natural person, except a wage-earner, or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any corporation engaged principally in manufacturing, trading, printing, publishing, [mining] or mercantile pursuits, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and

shall be subject to the provisions and entitled to the benefits of this Act. Private bankers, but not national banks or banks incorporated under State or Territorial laws, may be adjudged involuntary bankrupts.
[The bankruptcy of a corporation shall not release its officers, directors, or stockholders, as such, from any liability under the laws of a State or Territory or of the United States.]" (Additions made by 1903 amendment in brackets).

bility under the laws of a State or Territory or of the United States." (Public Law 294, 61st Congress, 36 Stat. at L. 838, chap. 412).

Under the 1898 Act, no corporation had been eligible to file a voluntary petition. Under the 1910 Act all corporations, except municipal, railroad, insurance or banking corporations, were authorized to do so. Section 4(b) in the 1898 version as amended in 1903 had subjected "any corporation engaged principally in manufacturing, trading, printing, publishing, mining, or mercantile pursuits" to involuntary bankruptcy. The 1910 amendment instead allowed "any moneyed, business, or commercial corporation, except a municipal, railroad, insurance, or banking corporation" to be adjudged an involuntary bankrupt. Moreover, the provision of the 1898 Act which had provided that "[p]rivate bankers, but not national banks or banks incorporated under State or Territorial Laws" could be adjudicated involuntary bankrupts was deleted.

According to statements made during the floor debate by Congressman Sherley, sponsor of both amendments to § 4, the revision in § 4(b) was intended to clarify what types of corporations could be adjudicated involuntary bankrupts by formulating a comprehensive definition with certain exceptions rather than by enumeration, as in the 1898 Act, of the specific categories of corporations subject to involuntary bankruptcy.

At the hearing before the House subcommittee which considered the amendments, Congressman Sherley referred to those corporations which were excluded by § 4(b) and stated:

"There has been excepted out of the law always certain corporations—for instance, municipal, railroad, insurance, or banking corporations—on the theory that all of those corporations partook either of a public or quasi-public nature that did not warrant their estates being adjudicated

through bankruptcy proceedings, and that it was wiser to hold them exempt from the law than to permit them to be thrown into bankruptcy by either voluntary or involuntary proceedings. This amendment does not, in that particular, change the law at all. Now these particular corporations are exempted. What is here proposed is to permit the voluntary filing of a petition by a corporation." Hearing before Subcommittee No. 1 of the Committee on the Judiciary on H.R. 18694 (bankruptcy), Feb. 3, 1909.

In its report on the proposed 1910 amendments, the House Committee on the Judiciary wrote:

"The words substituted are taken from the bankruptcy law of 1867, and their meaning has long since been settled by the courts. The reason for exempting the quasi public corporations will be apparent. Banks are excepted from the operation of the law at present. Other business entities having similar responsibilities to the public are now also excepted." House Report 511 (61st Congress, 2d Session) (1910) at 5.

*3. The 1932 Amendment* [5]

In 1932 building and loan associations were added to the list of corporations excepted from the provisions for voluntary and involuntary bankruptcy. In recommending the bill to the House, the House Judiciary Committee wrote:

"The purpose of the bill is to exempt building and loan associations from the operation of the national bankruptcy law. When the national bankruptcy law was drafted it was thought wise to exempt from its operation municipal, railroad, insurance, and banking corporations. At that time building and loan associations were not as extensive and through oversight or otherwise these associations were not included in the exemption. Every reason which obtains for exempting the

---

5. Congress revised the Bankruptcy Act in 1938 and, at that time made certain changes

in § 4(b), but none of them were addressed to the "banking corporation" exception.

corporations above referred to obtains in so far as building and loan associations are concerned. . . . It has been suggested that by reason of the fact that in two States in the Union no law exists controlling building and loan associations that this might be a reason for not exempting these associations from the operation of the bankruptcy law. It will be remembered that if the bankruptcy law is not invoked in connection with building and loan associations that this in no way interferes with the State equity laws and whether a State has supervisory control over building and loan associations or not those interested may at all times take advantage of State insolvency laws." House Rep. 98 (72nd Congress, 1st Sess. 1932).

## V.

### The Import of the History

In sum, the exception for "banking corporations" from the benefits of voluntary bankruptcy was first enacted in those words in 1910, but the policy of excluding banks from aspects of the Act was earlier conceived in the 1898 version of § 4(b). However, unlike the 1898 statute, which expressly excepted national, state or territorial banks from involuntary bankruptcy, the 1910 amendment eliminated any reference to a bank's place of incorporation. To prevail, IBB must therefore demonstate that, despite the change in language, Congress intended the jurisdictional rule of the earlier statute to survive the 1910 revision. IBB relies on two sources to support this construction: the views of members of Congress and the policies underlying the exception as evidenced in legislative history and as construed by courts.

Specifically, IBB relies upon the statements made by Congressman Bodine in 1898 (see *supra* at pp. 1164–1165) and Congressman Sherley in 1909 (see *supra* at p. 1166) as evidence that (1) Congress exempted only national, state and territorial but not foreign banks from involuntary bankruptcy in 1898;

and (2) Congress did not intend the exception to be expanded in 1910 to cover foreign banks. FDIC and Commonwealth object at the outset to giving weight to these statements because the case at hand involves a voluntary petition, and the congressional remarks in question were not addressed to § 4(a) which relates to voluntary bankrupts. In addition, they argue that the phrase "national banks and banks incorporated under State or Territorial Laws" in § 4(b) of the 1898 Act never modified the exception for "banking corporations" in § 4(a) of that statute. FDIC and Commonwealth consequently argue that the history of and reason for the specific reference to national, state and territorial banks in the exceptions to involuntary bankruptcy is only tangentially relevant to the construction of the banking exception for voluntary bankruptcy.

Although the history outlined above is correctly stated, we disagree with the conclusion that appellants draw from it. The exception in the present Act for "banking corporations" is identical in §§ 4(a) and (b). Whatever the helpfulness of maxims of construction in general, common sense dictates that the same words used in different parts of the same statutory provision should, absent evidence to the contary, be accorded the same meaning. See *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 149–159, 64 S.Ct. 474, 88 L.Ed. 635 (1944). Therefore, if the exception in § 4(b) only covers national, state and territorial banks, that fact is relevant to the determination whether foreign banks are covered under § 4(a).

### A. Congressman Bodine's Fears

IBB first points to the statement in 1898 of Congressman Bodine advocating the exclusion of "trust companies, savings banks, and all other State banks" from § 4(b) to avoid interference with state regulation of these institutions. (see *supra* at pp. 1164–1165) IBB argues that Congressman Bodine's comments evidence a concern only that state, as distinct from foreign, banks be excluded

from the Act and that he was unconcerned with the question whether foreign banks could be adjudicated involuntary bankrupts. According to IBB, when the Conference Committee added the phrase excluding state or territorial banks to § 4(b), it "apparently accepted Congressman Bodine's position." (IBB Memorandum at p. 24) IBB concludes from this that Congress did not mean to exclude foreign banks.

We do not draw the same conclusion. For one thing, because the Congressman did not consider foreign banks at all, his statements shed no light on the issue. Moreover, it is not even clear that Congressman. Bodine's attitude towards state banks was accepted by Congress as a whole. As Dean Sovern has pointed out in "Section 4 of the Bankruptcy Act: The Excluded Corporations,"

". . . It might be argued that Congress left the insolvency administration of banking and insurance corporations and building and loan associations to state law for the reasons suggested by Mr. Bodine, that '[I]n nearly every State in the Union there are chapters on chapters of the statutes regulating to the smallest minutia the proceedings in case of the insolvency of any of those classes of corporations.' . . . *The argument suffers badly from the lack of evidence in the history of section 4 that the rest of Congress shared Mr. Bodine's views.*" 42 Minn.Law 171.180 (1957) (emphasis added).

Moreover, Congressman Bodine was neither the sponsor of the 1898 Act in the House nor a member of the committee which drafted the legislation. There is no reason to view the statement as other than the view of one Congressman.[6]

*B. The Import of Congressman Sherley's Statement*

IBB places great emphasis on Congressman Sherley's statement that the 1910 amendment to § 4(b) did not "change the law [regarding excepted corporations] at all" as "crucial evidence" that Congress implicitly deemed the term "banking corporations" to include only national, state or territorial banks. (see *supra,* p. 1166).

However, even assuming that IBB interprets Congressman Sherley's statement correctly to mean that the exception in the 1910 Act was intended to have the identical effect of its 1898 predecessor, this view is beneficial to IBB's position only if the effect of the 1898 exception was itself limited to national, state and territorial banks. Unfortunately, a close analysis of that Act does not produce a clear cut answer.

We start with the language of § 4(b) of the 1898 Act which specifies what entities can be adjudicated involuntary bankrupts. *Un*incorporated companies could be adjudged involuntary bankrupts regardless of the nature of their businesses. However, in the case of corporations, only those "engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits" fell in that category, and of course, even IBB does not suggest that banks are principally engaged in manufacturing, printing or publishing. Although Congress did not define the terms "trading" or "mercantile pursuits," IBB does not contend that banks operate in those fields and, indeed, the decisions in *Zugalla v. International Mercantile Agency,* 142 F. 927 (3d Cir. 1906), *In re Surety Guarantee & Trust Co.,* 121 F. 73 (7th Cir. 1902), and *In re New York & W. Water Co.,* 98 F. 711 (S.D.N.Y.) *aff'd* 102 F.

---

6. The Supreme Court and commentators have suggested that expressions in debate by individual legislators (other than the member in charge of the bill) should be disregarded. See *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 318, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); Ten

Broock, "Admissibility of Congressional Debates in Statutory Construction by the United States Supreme Court," 25 Calif.L.Rev. 326 (1937). Even if the rule is more honored in the breach, the caution it counsels is wise.

1004 (2d Cir. 1900) are consistent with the view that they did not.[7] Thus, it is plain that no banking corporation could be adjudged an involuntary bankrupt under the 1898 Act (see *Murphy v. Penniman,* 105 Md. 453, 469, 66 A. 282 (1907)) unless, as IBB argues, the *exclusionary* language of § 4(b) in 1898 leads to a different conclusion.

One is therefore left to grapple as at the outset with the meaning of the last sentence of § 4(b) of the 1898 Act:

> "Private bankers, but not national banks or banks incorporated under State or Territorial laws, may be adjudged involuntary bankrupts."

If the analysis above as to the *inclusionary* language in § 4(b) is correct, this final sentence is rendered mere surplusage. Interpretations offered by each side as to the reason for its inclusion do not detract from the persuasiveness of this view, for if all banks were outside the scope of the *inclusionary* language of § 4(b), specification of only certain types of banks in the *exclusionary* language of the section adds nothing to the effect of the statute.

The question ought not be settled on such an uncertain basis, if any firmer ground exists. Moreover, we are loath to decide a case as important as this on whatever conclusions IBB would have us draw from an isolated comment made by a single Congressman, even one who sponsored the bill.[8] Furthermore, we note the irony of IBB's position which depends on that portion of § 4(b) which specifies who may *not* be adjudged an involuntary bankrupt in order to demonstrate who *may*. Such an analysis is especially weak where, as here, so little meaningful history is to be found. IBB argues that non-inclusion in an exclusion results in inclusion. That is, it contends that the failure to include foreign banks in the sentence which excludes national, state and territorial banks results in the determination that foreign banks are among the types of corporations who may be adjudged involuntary bankrupts. But this syllogism runs crashing into the hard, clear language of the coverage clause of § 4(b) which simply does *not* authorize the involuntary bankruptcy of a bank.

The plain fact is that the legislative history offers no clue why Congress inserted the limitation as to national, state and territorial banks, and appellants' suggestion that the phrase is mere surplusage is no more than an educated guess.

■ In sum, none of the theories urged by either side obviates the fact that there is no indication that Congress, either in 1898 or 1910, considered the effect of the exception as to foreign

---

7. See also *In re New York Building-Loan Banking Co.,* 127 F. 471 (S.D.N.Y.1904) where the court held that because the debtor did not fit within the enumerated classes of included corporations it was not subject to the Act, and stated:

> "The authorities under the present act seem decisive. They hold, in substance, that the intention of the present bankrupt act, the provisions of which are much more restrictive than those of the earlier bankrupt acts, was to exclude from the operation of the act banks, railroad, telegraph and express companies, and all corporations except those mentioned in the act. By the provisions of the present act the corporations which can be put into involuntary bankruptcy are those 'engaged principally in manufacturing, trading, printing, publishing, mining, or mercantile pursuits.' These

terms are to be taken in their natural and usual meaning, and any corporation which does not come within such meaning cannot be put into bankruptcy. I think that an ordinary building and loan association is not a corporation which is included in the provision quoted." 127 F. at 471–72.

8. Unlike Congressman Bodine in 1898, Congressman Sherley was the sponsor of the 1910 bill in the House and his statements should not "be dismissed out of hand" as ones reflecting only his view. *United States v. Enmons,* 410 U.S. 396, 405 n. 14, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). However, the teaching of Justice Frankfurter that judges "not delve into the mind of legislators or their draftsmen, or committee members" is nevertheless apt. Frankfurter, "Some Reflections on the Reading of Statutes," Col.L. Rev. 527, 539 (1947).

banks. We therefore proceed to consider the policies underlying the exception to determine whether its application to foreign banks would further or would thwart the objectives of the statute.

### VI.

### The Purposes of the Exception

A. *Existence of Alternate Regulation*

A variety of courts which have considered the exceptions to § 4 of the 1910 Act have concluded that Congress excepted railroads, municipal, insurance and banking corporations because of the existence of pervasive state regulations over these activities.

For example, as the court in *Woolsey et al. v. Security Trust Co.*, stated:

"The letter of that section excludes banking and insurance corporations; its spirit and purpose, to leave the liquidation or the banking corporations of the country to the well-organized departments of the states and the nation organized for the purpose of supervising while they are going concerns and of liquidating them when they are not, excludes them. *Federal laws provide elaborately for the supervision and liquidation of national banking corporations; the laws of the states do the same for state banks and insurance companies, in order to protect the millions of persons who deal with them on the faith of the protection afforded by direct governmental supervision and control.* It was considered that it would be a ruinous thing to the state, to the depositors, and to the creditors to have the elaborate scheme of liquidation which the state provides broken into and nullified by bankruptcy proceedings, and it was intended, by withdrawing jurisdiction over these corporations from the bankruptcy court, that this would not occur. It would be directly contrary to the purposes so definitely and comprehensively expressed, to exempt banking corporations from the act, leaving their administration and liqui-

dation to the state and federal systems devised expressly for them, to hold that this bank and trust company is not exempt, chartered though it was under the state banking laws, with banking privileges and powers, operated though it was under those laws, and now being liquidated, as it is, under them." 74 F.2d 334, 337 (5th Cir. 1934). (Emphasis added).

Although the Court of Appeals for this Circuit admitted in *Union Guaranty & Mortgage Co. v. Van Schaick, Supt. of Ins.*, 75 F.2d 984 (2d Cir. 1935) that "The purpose of the exception is not self evident; we must infer it as best we can from such similarity as exists between the excepted groups," it nevertheless observed that:

"The most natural inference is that Congress meant to leave to local winding up statutes the liquidation of such companies; that, since the states commonly kept supervision over them during their lives, it was reasonable that they should take charge on their demise." *Id.*

And in *In re Island Mortgaging Corp.*, 18 F.Supp. 448, 449 (E.D.N.Y.1937), the court remarked:

"Congress has seen fit to exclude from the operation of the Bankruptcy Act certain types of corporations which, because of their quasi public nature, were assumed to belong wholly under state supervision and control."

As recently as April of this year, the district court in *In re Equity Funding Corp. of America* considered the exception for insurance companies and analyzed the Congressional purpose in excluding insurance companies in terms logically applicable to banking corporations:

"Congress in enacting Section 4 decided that liquidation of insurance companies should be left to the states. *In Re Union Guarantee & Mortgage Co.*, 75 F.2d 984 (2d Cir. 1935); *In Re Supreme Lodge of the Masons Annuity*, 286 F. 180, 184 (N.D.Ga.1923). Since the reorganization of an insur-

ance company or its adjudication as a bankrupt under the Act would preempt state liquidation proceedings for that company, Congress enacted Section 4 to preserve the exclusive jurisdiction of the states over the liquidation of insurance companies and to prevent the reorganization of insurance companies or their adjudication as bankrupts. *See Woolsey v. Security Trust Co.*, 74 F.2d 334, 337 (5th Cir. 1934).

By preserving state liquidation proceedings, Congress sought to prevent bankruptcy or reorganization courts from interfering with comprehensive state insurance regulations and with the rights of those insured protected by such regulations. *See In Re Union Guarantee & Mortgage Co., supra; In re Superior Lodge of the Masons Annuity, supra.* As the language of Section 4 suggests, Congress determined that interference with state insurance regulations would not occur as long as bankruptcy courts did not reorganize insurance companies or adjudge them to be bankrupts." 396 F.Supp. 1266 at 1275 (C.D.Cal. April 11, 1975).

See, in general, C. Seligson and L. King, "Jurisdiction and Venue in Bankruptcy", 36 *Journal of the National Assoc. of Referees in Bankruptcy*, 38.

Comments by Congressman Bodine (see *supra*, at pp. 1164–1165) and other legislators during debate on the 1898 Act suppport the view that Congress considered the existence of alternative regulatory mechanisms a reason for excluding national, if not state and territorial banks. See, e. g., 30 Cong.Rec. 606 (1897). However, as Dean Sovern has noted, while "[t]here is slight support in the deliberation preceding the passage of the Act in 1898, and in the debate preceding the exemption of building and loan associations [for the theory that Congress excepted the corporations because of alternate state regulation]", there is

"[H]ardly enough to sustain the proposition that Congress excluded banks,

insurance corporations and building and loan associations primarily because they were so extensively regulated by the states. The argument suffers, too, from Congress' failure to exclude all closely regulated enterprises from bankruptcy." 42 Minn.L.Rev. *supra* at p. 180.

Moreover, if a desire to bequeath the regulation of banks to the states was one of Congress' objectives, the statutory scheme did not consistently achieve that result because in 1898 not every state or territory had enacted laws for the control and liquidation of banks. (E. g., Texas, see Gen.L.Tex. 1st Sess. Ch. 10 (1905); Washington, see Washington Code Ann. Title 41 (1912)). Indeed, some courts held that the absence of a state regulatory mechanism was irrelevant. For example, in *In re Oregon Trust & Savings Bank*, the court noted:

"Under the statutes of the state of Oregon provisions are made for forming corporations, and by virtue of such laws, therefore, corporations might be and are frequently formed for carrying on a banking business. The organization of banks, therefore, comes within the purview of the statutes, and *it does not seem to me that it makes any difference as to the effect of the law that no particular laws were made until recently for the regulation of banks organized under the laws of the state.* The banks are, nevertheless, organized for the purpose of carrying on a banking business, and hence such corporations come within the intendment of that clause of the bankruptcy act which has been theretofore alluded to, and therefore are not subject to be adjudged involuntary bankrupts." 156 F. 319, 320 (D.Or. 1907). (emphasis added).

Further support for the view that Congress did not regard alternative regulation as the *raison d'etre* for the exceptions is found in the language of the House Report on the 1932 amendment which added building and loan associa-

tions to the list of excepted corporations:

"This legislation is sponsored by the United States Building and Loan League, and so far as the committee has been able to ascertain no one connected with building and loan associations opposes this legislation. However, it has been suggested that by reason of the fact that in two States in the Union no law exists controlling building and loan associations that this might be a reason for not exempting these associations from the operation of the bankruptcy law. It will be remembered that if the bankruptcy law is not invoked in connection with building and loan associations that this in no way interferes with the State equity laws and whether a State has supervisory control over building and loan associations or not those interested may at all times take advantage of state insolvency laws." (House Report 98, 72d Cong., 1st Sess. 1932)

If state regulation was indeed the motivation behind the banking corporation exception, then Congress was inconsistent in permitting private bankers to be adjudicated involuntary bankrupts in 1898, since allowing such an adjudication did in fact interfere with state regulation. In *In re Salmon & Salmon,* 143 F. 395 (W.D.Mo.1906) the court refused to give effect to state laws governing the winding up of a private bank owned by a partnership on the grounds that the operation of the state statute was preempted by the Bankruptcy Act. See

also *In re Faour,* 72 F.2d 719 (2d Cir.), *cert. denied,* 293 U.S. 613, 55 S.Ct. 143, 79 L.Ed. 703 (1934); *In re Bajardi,* 9 F.2d 797 (2d Cir.), *cert. denied,* 270 U.S. 651, 46 S.Ct. 351, 70 L.Ed. 781 (1926); accord, *State of Missouri v. Angle,* 236 F. 644 (8th Cir. 1916).[9]

Furthermore, if Congress intended to exclude from bankruptcy adjudication certain companies for which there was already an extensive regulatory scheme for liquidation, the liquidation laws and banking laws of foreign countries such as the United Kingdom could serve that objective as easily as state schemes.

In any event, appellants argue that New York [10] has enacted ample statutory provisions to cover bankrupts such as IBB. They point out that foreign banks doing business in New York are subject to the regulations of state authorities. E. g., N. Y. Banking Law § 200 *et seq.* If these banks become insolvent, liquidation proceedings may be pursued and a state official may acquire possession of the bank's business for the protection of creditors. E. g., N. Y. Banking Law § 605 *et seq.* IBB responds that these statutes are ineffective as to it because it never carried on banking business here. In such a situation, formal liquidation proceedings may not be authorized by statute, but New York Business Corporation Law § 1202(a)(4) provides that a receiver of the property of the corporation can be appointed by the court in the following situation, which presumably applies to IBB: [11]

"An action to preserve the assets in this state, of any kind, tangible or in-

9. There was a similar interference with state regulatory schemes in the insurance area prior to the 1938 deletion of "any unincorporated company" from Section 4b. See *Republic Underwriters v. Ford,* 100 F.2d 511 (5th Cir. 1938); *In re Minnesota Insurance Underwriters,* 36 F.2d 371 (D.Minn.1929).

10. Appellant did not cite the statutes of other states although they contend that the liquidation of IBB would be supervised by the laws of other states as well.

11. Section 1202(a)(4) of the Business Corporation Law and its predecessor have been

applied to foreign banks with assets in New York. See, e. g., *Stephen v. Zivnostenka Banks,* 31 Misc.2d 10, 155 N.Y.S.2d 340 (1956), *aff'd* 2 A.D.2d 958, 157 N.Y.S.2d 903, *aff'd,* 2 A.D.2d 958, 157 N.Y.S.2d 904, *aff'd,* 3 N.Y.2d 862, 166 N.Y.S.2d 309, 145 N.E.2d 24 (1957), *appeal dismissed,* 356 U.S. 22, 78 S.Ct. 560, 2 L.Ed.2d 578 (foreign bank had been nationalized); *Augstein v. Banska A. Hutui Akciova Spolecnost,* 124 N.Y.S.2d 446, *modified on other grounds,* 282 App.Div. 929, 125 N.Y.S.2d 647 (1953); (foreign bank had been nationalized).

tangible, of a foreign corporation which has been dissolved, nationalized or its authority or existence otherwise terminated or cancelled in the jurisdiction of its incorporation or which has ceased to do business, brought by any creditor or shareholder of such corporation or by one on whose behalf an order of attachment against the property of such corporation has been issued."

### B. Other Objectives Underlying the Banking Exception

■ Purposes other than that of alternative state regulation have been suggested as prompting the enactment of the banking corporation exception. In holding that a fraternal organization was not subject to the Act as an insurance corporation, the court in *In re Supreme Lodge of the Mason's Annuity* stated that while "No reasons for making these exceptions [for municipal, railroad, insurance or banking corporations] were assigned by the committees of Congress," three reasons other than that of alternate state regulation "might be surmised":

(1) "the public or quasi public nature of the business, involving other interests than those of creditors";

(2) "the desirability of unarrested operation"; and

(3) "the inappropriateness of the bankruptcy machinery to their affairs." 286 F. 180, 184 (N.Ga.1934).

Remarks by Congressman Sherley and statements in the 1910 House Judiciary Report (*supra* at p. 1166) support the theory that the quasi-public nature of the exceptions was a common basis of their enactment. As the Second Circuit has noted:

"All except municipalities are companies for profit whose businesses are now generally regarded as 'affected with a public interest'; that is to say, as touching enough persons who must deal with them at some economic disadvantage, to require public supervision and control." *Union Guaranty & Mtge Co. v. Van Schaick, supra,* 75 F. 2d at 984.

*Accord, In re Island Mortgaging Corp., supra; In re National Mortgage Corporation,* 17 F.Supp. 54, 55 (D.N.J.1935); *In re Prudence Co., Inc.,* 10 F.Supp. 33, 39 (E.D.N.Y.) *aff'd,* 79 F.2d 77 (2d Cir.), *cert. denied sub nom. Egbert v. Callaghan,* 296 U.S. 646, 56 S.Ct. 247, 80 L.Ed. 459 (1935); see *In re Equity Funding Corp. of America, supra; Columbia Ry. Gas & Elec. Co. v. South Carolina,* 27 F.2d 52, 55 (4th Cir. 1928).

It is true that in the case of each type of excluded corporation, Congress might well have determined, first, that social and economic interests deserved greater consideration than the interest of equality of distribution among creditors that the Bankruptcy Act in general seeks to achieve; and second, that regulation by states was more appropriate. But if Congress understood the importance of maintaining confidence and stability in the banking system, that concern does not logically demand the creation of a distinction between domestic and foreign banks, given the existence of alternate schemes of regulation of foreign banks by other countries such as here, the United Kingdom.

Turning to the next suggested objective—the desirability of unarrested operation in order to maintain confidence in the institution and in the economy in general—it is logical that Congress might have desired to avoid closing a major bank upon its becoming insolvent if there was any practical way to transfer the banking business of that corporation to a solvent corporation without cessation of operation. The recent memory of the bankruptcy of Franklin National Bank is testimony that such a consideration is of continuing importance. However, no reason suggests itself why the same consideration would

not be of equal significance in the case of a foreign bank with assets, creditors or depositors here.

As to the last purpose enumerated by the court in *In re Supreme Lodge*, that is, that the bankruptcy machinery is inappropriate to winding up the affairs of a bank, the argument applies with equal force both to domestic and foreign banks. Moreover,, if the process of bankruptcy under the Act is ill suited for winding up of the affairs of a bank with a large number of creditors, neither in 1898 nor in 1910 did Congress view this problem as a stumbling block in the case of private banks, which might have as many creditors as corporate banks but which could nevertheless be adjudged involuntary bankrupts in 1898.

■ We conclude that there is nothing inherent in the probable objectives of Congress which requires or suggests that the exclusion of "banking corporations" from the coverage of the Act should apply to domestic but not foreign banks.[12]

tion to foreign banks and the dearth of authority to support the position of either side, § 4 should be construed to achieve the "equitable" objectives of the Bankruptcy Act, that is the generally equal distribution of assets among creditors. As stated earlier, both Franklin, FDIC's predecessor in interest, and Commonwealth filed liens within four months of IBB's petition. If the bankruptcy court has jurisdiction, the liens may be invalidated. To recognize the priority of FDIC and Commonwealth IBB argues, would give them an advantage over foreign creditors in derogation of Congress' intention to ensure generally equal distribution among creditors.[13]

■ We agree with FDIC and Commonwealth that this argument presupposes jurisdiction under the Act and is of no relevance to the initial determination whether jurisdiction exists. The purpose of enacting the exceptions in § 4 was not to achieve equality of distribution, but to avoid application of the bankruptcy laws to what Congress viewed as inappropriate situations.

## VII.

### Equitable Considerations

IBB argues that in view of Congress' failure to give the slightest considera-

## VIII.

### Conclusion

■ Despite the variegated mechanisms available to interpret legislation,

---

12. Nor do we find any basis for distinguishing between banking corporations which are actively engaged in banking and those which are not. Even if it may be argued that the objectives of deferring to state regulation, or maintaining the continuity of operations of a bank are more clearly applicable to corporations actively engaged as banks then those which are not, the Act simply makes no such distinction as to domestic banks.

Perhaps all that a sustained effort to find the "meaning" of the statutory language at hand proves is that, as one astute observer has commented:

" . . . overemphasis on legislative guides may lead to a distorted view of the statutory purpose no less than literalism, for much less thought is spent on the fu-

ture implications of committee reports and explanations on the floor than in choosing the words of a statute . . . " A. Cox, "Judge Learned Hand and The Interpretation of Statutes," 60 Harv.L.Rev. 370, 381 (1947).

13. See *Disconto Gesellschaft v. Umbrecht*, 208 U.S. 570, 582, 28 S.Ct. 337, 341, 52 L. Ed. 625 (1908) in which the Supreme Court noted " . . . the well recognized rule between states and nations which permits a country to first protect the rights of its citizens in local property before permitting it to be taken out of the jurisdiction for administration in favor of those residing beyond its borders."

"the final rendering of the meaning of a statute is an act of judgment."[14] Where scrutiny of the legislative history unearths no clue that Congress has considered application of the statute to the particular facts at hand and where adherence to the statutory words themselves does not frustrate the general objectives of the legislation, the words must be given effect as they read. Here the words of the statute read:

"(a) Any person, except a municipal, railroad, insurance, or banking corporation or a building and loan association, shall be entitled to the benefits of this title as a voluntary bankrupt."

and must in the circumstances be taken to mean what they say: that foreign banking corporations are precluded from seeking adjudication as voluntary bankrupts.

In reaching this conclusion we make no attempt to pronounce what Congress' action might have been had it ever considered whether foreign banks should be accorded the right to file voluntary petitions. To do so would be to rush in where angels fear to tread. As Justice Frankfurter wisely advised:

"To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities . . . Various considerations of parliamentary tactics and strategy might be suggested for the inaction of . . . Congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle." *Helvering v. Hallock*, 309 U.S. 106, 119, 121, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940).

The decision of the Bankruptcy Court is reversed. The petition of Israel British Bank is dismissed.

It is so ordered.

14. Frankfurter, "Some Reflections on the Reading of Statutes," *supra*, 30 Harv.L.Rev. at 531.