536 F.2d 509
 In the Matter of Israel-British Bank (London) Limited, s. Corp.
ISRAEL-BRITISH BANK (LONDON) LIMITED, Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, as successor in
Interest to FranklinNational Bank, and Bank of the
Commonwealth, Appellees.
 No. 721, Docket 75-5020.
 United States Court of Appeals,
Second Circuit.
 Argued March 12, 1976.
Decided May 25, 1976.
 
 Jack Gross, New York City (Sheldon Lowe, Bruce L. Heller and Krause, Hirsch & Gross, New York City, of counsel), for appellant.
 Herbert P. Jacoby, New York City (Edward B. Samuels and Burns & Jacoby, New York City, of counsel), for appellee Bank of the Commonwealth.
 John J. Walsh, New York City (Earl H. Nemser, Reid L. Ashinoff and Cadwalader, Wickersham & Taft, New York City, of counsel), for appellee Federal Deposit Ins. Corp.
 Before FRIENDLY, MULLIGAN and GURFEIN, Circuit Judges.
 GURFEIN, Circuit Judge:
 
 
 1
 The Israel-British Bank (London) Ltd. ("IBB") was a British bank engaged in the banking business in London. It did no banking business in the United States, nor was it licensed in any state to do such business. It did borrow Eurodollars and U.S. dollars from American banks, including appellees, among others. It also maintained deposits in United States banks.
 
 
 2
 On July 11, 1974, a loan of Eurodollars made to it by the Franklin National Bank ("Franklin"), the principal and interest amounting to approximately $2,100,000, became due and was not paid. On July 15, 1974, a loan of U.S. dollars made to it by the Bank of the Commonwealth ("Commonwealth"), a Michigan bank, in the amount of $500,000 plus interest, became due and was not paid.
 
 
 3
 On July 22, 1974, Commonwealth started an action against IBB in the Southern District of New York to recover its loan with interest and obtained an order of attachment in the sum of $515,385.42 plus probable interest. The order of attachment was served on a number of banks holding deposits of IBB and attachments were made.
 
 
 4
 On July 26, 1974, Franklin followed suit and obtained an order of attachment which was served on a number of banks in New York. Commonwealth made personal service on IBB in London on August 6, 1974, and obtained a final default judgment for $519,923.90, which was entered in the Southern District on September 11, 1974. Franklin itself is now being liquidated by appellee Federal Deposit Insurance Corporation.
 
 
 5
 In the meantime, while these matters were proceeding in the federal court, IBB, being unable to pay its debts, voluntarily filed a debtor's petition for the winding up of its affairs, pursuant to Section 222 of the English Companies Act, 11 & 12 Geo. 6, c. 38 (1948), with the High Court, Chancery Division, of the United Kingdom.[1] On August 6, 1974, a receiving order was made by that court constituting Arthur Thomas Cheek, Senior Official Receiver, as Receiver and Provisional Liquidator of the property of petitioner.
 
 
 6
 On September 23, 1974, before Franklin could obtain a judgment, and before Commonwealth could compel payment of the default judgment it had obtained, IBB filed a voluntary petition in bankruptcy in the Southern District of New York. It was adjudicated a bankrupt on the same day. The appellees promptly filed motions to vacate the adjudication and to dismiss the voluntary petition on the ground that the Bankruptcy Court lacked jurisdiction over the subject matter.
 
 
 7
 While the motions were sub judice before Bankruptcy Judge Galgay, the High Court in England issued an order dated October 9, 1974 authorizing the appointment of counsel in New York "to take such steps and to institute such proceedings including the filing of a bankruptcy petition against the company as they may advise and as the said Official Receiver may authorize them to take to insure that the assets of the said company situate in the United States of America become available for the benefit of creditors general."
 
 
 8
 We take the bankruptcy proceeding here to be in aid of the order of the High Court that the assets in the United States become available to the creditors on the basis of equality. If the assets involved had been situated in the United Kingdom, the High Court could have restrained and set aside the attachment and judgment as having been made within six months of the petition for winding up. See Companies Act, 11 & 12 Geo. 6, c. 38, § 320(1) (1948). But the High Court, of course, has no extraterritorial jurisdiction beyond the United Kingdom.
 
 
 9
 If there is jurisdiction to sustain the American adjudication in bankruptcy of IBB, the American trustee will be in a position to bring a proceeding for avoidance of liens obtained by attachment or judgment within four months of the filing of the petition if the bankrupt was insolvent at the time. Bankruptcy Act § 67a(1), 11 U.S.C. § 107(a)(1). If there is no jurisdiction to entertain a voluntary bankruptcy petition for IBB, the liens will be good, and appellees will fare better than United States creditors among others.
 
 
 10
 Section 4a of the Bankruptcy Act, 11 U.S.C. § 22(a), on which appellees' motion to vacate and dismiss was grounded, provides as follows:
 
 
 11
 "Any person, except a municipal, railroad, insurance, or banking corporation or a building and loan association, shall be entitled to the benefits of this title as a voluntary bankrupt."
 
 
 12
 IBB, if it is considered simply as a foreign corporation, was entitled to voluntary bankruptcy under Section 2a(1) of the Bankruptcy Act, 11 U.S.C. § 11(a)(1), even though it did not have its "principal place of business . . . or . . . domicile" in the United States, since it had property "within their jurisdiction" (i. e., within the jurisdiction of the Bankruptcy Courts of the United States). As the Bankruptcy Judge found, IBB had property in the Southern District in the form of deposits of money held by five banks in New York City.
 
 
 13
 Appellees maintain, however, that IBB is a "banking corporation" and, as such, is not entitled to the benefits of voluntary bankruptcy. Bankruptcy Judge Galgay, in a thorough opinion, held that IBB was not a "banking corporation" within the meaning of the Bankruptcy Act and denied the motions to dismiss the voluntary petition. On appeal, the District Court, Morris E. Lasker, Judge, in an equally scholarly opinion, reversed the decision of the Bankruptcy Court and dismissed the petition in bankruptcy. 401 F.Supp. 1159 (S.D.N.Y.1975). This appeal followed.
 
 
 14
 The case is one of first impression and involves an interesting question of statutory construction. We have concluded that the petition in bankruptcy by IBB should not have been dismissed. We accordingly reverse.
 
 
 15
 All parties have briefed the legislative history of Section 4 quite extensively in an attempt to find some elusive clue to its meaning. Judge Lasker ultimately concluded that "when Congress in 1898 and 1910 specified in § 4 of the Bankruptcy Act who may and may not be adjudicated a bankrupt, it did not specifically address the question before us: Does the Bankruptcy Court have jurisdiction to entertain a foreign banking corporation's voluntary petition in bankruptcy?" 401 F.Supp. at 1160. Though recognizing that Congress had not specifically addressed the question, the judge, after exploring whether application of the exception to foreign banks "would further or would thwart the objectives of the statute," id. at 1170, felt constrained to follow the "plain meaning" of the words.
 
 
 16
 There is no field in which contrary conclusions based on contrary premises may be so readily drawn as in the interpretation of statutes. In a sense, each statute stands on its own. And it may be disputed whether words, even in their common-sense meaning, bring a sure guide to interpretation of every statute. As Justice Frankfurter noted, "(o)ne must also listen attentively to what it (the statute) does not say." Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 536 (1947). This statute says nothing about "foreign banking corporations" as such.
 
 
 17
 If we acknowledge, as did the District Court, that Congress failed to consider foreign banking corporations when creating the exceptions to eligibility for bankruptcy, are we, nevertheless, required to recognize within the exception what was never in its consideration? There is no plain meaning in "banking corporation" to compel such a result. See McBoyle v. United States, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816 (1931), where Justice Holmes found that an airplane was not a "motor vehicle" though it was propelled by a motor.
 
 
 18
 Since we cannot find a final answer in the words themselves, we must employ other methods. We may consider the history of the phrase as it finally evolved, with particular reference to the language used in earlier statutes. We may also search for the policy intended to be enacted. As Justice Cardozo wrote: "(The words) came into the statute . . . freighted with the meaning imparted to them by the mischief to be remedied." Duparquet Huot & Moneuse Co. v. Evans, 297 U.S. 216, 220-21, 56 S.Ct. 412, 414, 80 L.Ed. 591 (1936). Here the inquiry is not philological; it is rather a search for legislative purpose, which is sometimes no more than a quest for a collective will that probably never existed. When the words create a general inclusionary category there is greater reason, perhaps, to accept a literal meaning in the absence of any particular purpose which contradicts it. When the statute is couched in terms of an exception, however, the task is somewhat different, for in the case of an exception we can hardly assume that excluding a particular category from a general class was utterly without purpose. If we find that there was a legislative purpose for the general exception which does not fit the narrower exception at issue, a court may justifiably conclude that the exception at issue is without the statute. Thus, the normal rule of construction is that where words of exception are used, they are to be strictly construed to limit the exception. Korherr v. Bumb, 262 F.2d 157, 162 (9 Cir. 1958); see Piedmont & Northern Ry. v. ICC, 286 U.S. 299, 311-12, 52 S.Ct. 541, 76 L.Ed. 1115 (1932); Midland Cooperative Wholesale v. Ickes, 125 F.2d 618, 626 (8 Cir.), cert. denied, 316 U.S. 673, 62 S.Ct. 1045, 86 L.Ed. 1748 (1942); In re Bay Cities Guaranty Building-Loan Ass'n, 48 F.2d 623, 624 (S.D.Cal.1931). As the Court said in Piedmont & Northern Ry. v. ICC, supra, 286 U.S. at 311-12, 52 S.Ct. at 545:
 
 
 19
 "The . . . Act was remedial legislation and should therefore be given a liberal interpretation; but for the same reason exemptions from its sweep should be narrowed and limited to effect the remedy intended."
 
 
 20
 The theme of the Bankruptcy Act is equality of distribution of assets among creditors, Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); Buchanan v. Smith, 83 U.S. (16 Wall.) 277, 301, 21 L.Ed. 280 (1873); 3 Collier on Bankruptcy P 60.01, at 743; see Young v. Higbee Co., 324 U.S. 204, 210, 65 S.Ct. 594, 89 L.Ed. 890 (1945), and correlatively avoidance of preference to some. 1 Remington on Bankruptcy § 17, at 34 (5 ed. J. Henderson 1950). The road to equity is not a race course for the swiftest.
 
 
 21
 We start with the recognition that a foreign corporation which has assets in the United States is generally amenable to bankruptcy here. IBB is such a body under Section 2 of the Act. To find that it is excluded from the general class of entities amenable to bankruptcy one would have to find a reason which illuminates the exception. We can find no convincing reason why a foreign banking corporation, not licensed to do business in the United States, conducting no semblance of a banking business here, and not under the regulatory supervision of any state or federal agency, should not qualify for the benefits of the Act as a voluntary bankrupt.
 
 
 22
 In reading federal statutes, we must also remember that the statutes are written with our federal system in mind. They normally reflect divisions of power between the federal government and the states of the union. Courts over the years have recognized that Section 4 provides for a division of power between the federal government and the states. See In re Union Guarantee & Mortgage Co., 75 F.2d 984 (2 Cir.), cert. denied, 296 U.S. 594, 56 S.Ct. 142, 80 L.Ed. 421 (1935); Woolsey v. Security Trust Co., 74 F.2d 334, 337 (5 Cir. 1934); In re Equity Funding Corp. of America, 396 F.Supp. 1266, 1275 (C.D.Cal.1975); In re Supreme Lodge of the Masons Annuity, 286 F. 180, 184 (N.D.Ga.1923).
 
 
 23
 So far as Congressional policy can be found for the exclusion of "banking corporations" from the benefit of the Bankruptcy Act, it is this. National banks were always subject to separate federal supervision and regulation, including their liquidation. State banks, chartered by the states, were subject to similar state regulation. No question of voluntary bankruptcy arose under the 1898 Bankruptcy Act, for no corporation of any kind was entitled to file a petition for voluntary bankruptcy under that Act. Under the 1898 Act any unincorporated company, as well as corporations of certain types, that is, those "engaged principally in manufacturing, trading, printing, publishing or mercantile pursuits," could be adjudged an involuntary bankrupt, however. But national banks and state-chartered banking corporations were excluded. Section 4b of the 1898 Act specifically provided that "(p)rivate bankers, but not national banks or banks incorporated under State or Territorial laws, may be adjudged involuntary bankrupts." Thus, it was apparently not the circumstance of being in the banking business that controlled, for private bankers were in that business as well. It was rather the existence of federal or state regulation of chartered banks.
 
 
 24
 This was articulated by the sponsor of the bill, Senator William Lindsay, 30 Cong.Rec. 606 (1897), and by the Report of the House Judiciary Committee, H.R.Rep.No.65, 55th Cong., 2d Sess. 40 (1897), which, as the District Judge recognized, "noted the existence of other insolvency provisions as a reason for excluding national banks." 401 F.Supp. at 1164. That report stated:
 
 
 25
 "The bill exempts national banks from being proceeded against in bankruptcy, for the reason that Congress has legislated especially in respect to them, and the most careful provisions exist for protecting all interests connected by the national banking laws."
 
 
 26
 The Conference Committee added the exception for banks incorporated under state law, simply explaining that they "are left to be dealt with by the laws of the State creating them." The inference is that considerations of federalism required that the states be allowed to liquidate as well as to regulate their own creations.
 
 
 27
 The 1910 amendments for the first time made corporations eligible for voluntary as well as involuntary bankruptcy. Amended Section 4a permitted any "person," which included any corporation "except a municipal, railroad, insurance, or banking corporation," to become a voluntary bankrupt. Similarly, Section 4b was amended to provide that "any moneyed, business, or commercial corporation" could be adjudged an involuntary bankrupt, "except a municipal, railroad, insurance, or banking corporation." The corporations excepted seem to be the same corporations that were excluded from the 1898 Act's provisions. The sponsor of the amendments to Section 4, Congressman Sherley, acknowledged this when he said:
 
 
 28
 "There has been excepted out of the law always certain corporations for instance, municipal, railroad, insurance, or banking corporations on the theory that all of those corporations partook either of a public or quasi-public nature that did not warrant their estates being adjudicated through bankruptcy proceedings, and that it was wiser to hold them exempt from the law than to permit them to be thrown into bankruptcy by either voluntary or involuntary proceedings. This amendment does not, in that particular, change the law at all."
 
 
 29
 Hearing on H.R. 18694 Before Subcommittee No. 1 of the House Committee on the Judiciary, 60th Cong., 2d Sess. (1909) (emphasis added).
 
 
 30
 This language does not, to be sure, prove that Congress intended to exclude foreign banking corporations from the exception, for they were not the subject of discussion. But the history does tend to explain the exception in terms of the considerations of federalism previously mentioned. As this court observed in In re Union Guarantee & Mortgage Co., supra, 75 F.2d at 984:
 
 
 31
 "The most natural inference is that Congress meant to leave to local winding up statutes the liquidation of such companies; that, since the states commonly kept supervision over them during their lives, it was reasonable that they should take charge on their demise."
 
 
 32
 We can find no other compelling reason why Congress chose to exempt banks from the benefits of the Act. Even if no statutory scheme for liquidation existed in a particular state, state courts of equity could fill the statutory gap. The distribution of federal-state power was not between a detailed liquidation statute and no statute at all. It was between control by the state, through its courts, of the liquidation of certain quasi-public corporations, and the liquidation of all other corporations through the federal bankruptcy laws.[2]
 
 
 33
 The District Court concluded in a reasoned opinion, nevertheless, that if Congress intended to exclude from bankruptcy adjudication certain companies for which there was already an extensive regulatory scheme for liquidation, then the liquidation laws and banking laws of foreign countries such as the United Kingdom could serve that objective as well as state schemes could. We think this reasoning elides the essential federalism implicit in the Bankruptcy Act.[3]
 
 
 34
 It is hardly a cogent argument that a receiver of property may be appointed in a New York State court under § 1202(a)(4) of the New York Business Corporation Law since, if such jurisdiction attached, it would be not because IBB is a "banking corporation," but only because it is a "foreign corporation." And a foreign corporation concededly would be eligible for bankruptcy if it has assets here. The availability of an alternative state remedy is not a good argument for appellees.
 
 
 35
 This is a case where United States creditors could be harmed if preferential liens were permitted to survive. Despite the speed of communications, the Atlantic Ocean remains as much a barrier to extraterritorial jurisdiction as ever it did. If IBB had been licensed to conduct a banking business in New York and had taken deposits here, it could be argued with some reason that the State of New York, having assumed supervision, should control the liquidation of its assets in New York rather than the Bankruptcy Court. That is what the New York courts did after the Bolshevik Revolution in the case of Russian insurance companies licensed to do business in New York under the supervision of the Superintendent of Insurance of the State. See, e. g., Moscow Fire Insurance Co. v. Bank of New York & Trust Co., 280 N.Y. 286, 299, 20 N.E.2d 758 (1939), aff'd by an equally divided Court, 309 U.S. 624, 60 S.Ct. 725, 84 L.Ed. 986 (1940). But IBB was never licensed to do business in New York and was never under the supervision of its Banking Department. There is no statute providing for its liquidation under the aegis of the Superintendent of Banks.
 
 
 36
 To find IBB to be a "banking corporation" within the meaning of Section 4 would require a "much clearer manifestation of intention than Congress has furnished." FTC v. Bunte Brothers, Inc., 312 U.S. 349, 355, 61 S.Ct. 580, 584, 85 L.Ed. 881 (1941) (Frankfurter, J.). Finding no Congressional purpose to command otherwise, we consider IBB not to be a "banking corporation" within the meaning of Section 4a of the Bankruptcy Act. In so doing, we avoid an inequitable result to its creditors, including the other American banks who have lost the race of diligence.
 
 
 37
 The order dismissing the petition in bankruptcy is reversed.
 
 
 
 [1]
 In the United Kingdom, companies (corporations) cannot be made bankrupt. Bankruptcy Act, 4 & 5 Geo. 5, c. 59, § 126 (1914). Accordingly, companies go through the equivalent winding-up procedure prescribed by the Companies Act, 1948. See Charlesworth's Company Law 356 (9 ed. T. E. Cain 1968)
 
 
 [2]
 The exception for railroads was doubtless due to the absence from the Bankruptcy Act until 1933 of any provision for reorganization in an industry where liquidation would generally have been considered to be unthinkable because of the public interest in rail transportation, and to the development of the federal equity receivership as an effective mechanism for reorganization
 
 
 [3]
 Appellees rely heavily on Clark v. Williard, 292 U.S. 112, 54 S.Ct. 615, 78 L.Ed. 1160 (1934) and 294 U.S. 211, 55 S.Ct. 356, 79 L.Ed. 865 (1935), but this reliance is misplaced. Those cases only held that the full faith and credit clause did not prevent one state from favoring its local levying creditors over a liquidator appointed by another state, insofar as claims to local property were concerned. They were not in any sense an interpretation of the Bankruptcy Act, nor an endorsement of what Justice Cardozo termed "a policy to allow the assets of an insolvent corporation to be torn to pieces at the suit of rival creditors when they could be distributed equally and without sacrifice at the hands of a receiver." 292 U.S. at 123, 54 S.Ct. at 620